UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD BOUCHARD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 05-187-B-W |
| | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In *Lovely v. Allstate Ins. Co.*,[1] the Maine Supreme Judicial Court adopted the single injury rule: where a tortfeasor aggravates a pre-existing condition, the tortfeasor is liable for the entire damage resulting from an indivisible combined injury and the law burdens the wrongdoer, not the innocent victim, with the difficulties of apportionment.   On January 19, 2003, as Richard Bouchard traveled northbound on Route 1 toward Caribou, Maine, he carried with him an unenviable set of pre-existing conditions, ranging from a history of legal and physical problems to drug abuse; however, after Dennis Harmon, a United States Border Patrol agent slammed his vehicle into Mr. Bouchard's, Mr. Bouchard's problems became worse.   The Court concludes that the United States largely failed to sustain its burden to apportion Mr. Bouchard's pre-existing conditions from the resulting combination of injuries and it awards Richard Bouchard $1,100,000.00.

## I.  OVERVIEW OF APPLICABLE LAW

The Federal Tort Claims Act provides that the "United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances[.]"  28 U.S.C. § 2674.  The plaintiff bears the burden to establish the liability of the United States "by showing that a

---

[1] 658 A.2d 1091 (Me. 1995).

private individual would be liable under state law – Maine law in this case – for similar conduct in the same circumstances." *Levesque v. United States*, 366 F. Supp. 2d 89, 94 (D. Me. 2005) (quoting *Clement v. United States*, 772 F. Supp. 20, 26 (D. Me. 1991)).   In *Levesque*, Magistrate Judge Kravchuk of this Court addressed a law suit initiated by Lora Levesque, the mother of minor plaintiff Brandon Bouchard, who was a passenger in the Bouchard vehicle and who was injured in the accident.  *Id.*  Magistrate Judge Kravchuk concluded that Mr. Harmon was negligent and that his negligence caused personal injuries to Mr. Bouchard's passenger.  *Id.* at 95.

After Mr. Bouchard initiated this law suit, he moved for summary judgment, contending that the United States was collaterally estopped from denying its negligence and upon recommendation of the magistrate judge and without objection from the United States, the Court granted Mr. Bouchard's motion for summary judgment precluding the United States from arguing that Mr. Harmon (and hence it) was free of negligence.  *Pl.'s Mot. for Summ. J.* (Docket # 7); *Report and Recommended Decision* (Docket # 18); *Order on Report and Recommended Decision* (Docket # 19).  The Order left open the possibility that the United States could argue that Mr. Bouchard had been comparatively negligent.  *Order on Report and Recommended Decision* at 1.

On October 20, 2006, however, Mr. Bouchard moved for partial summary judgment on the affirmative defenses of comparative fault/contributory negligence.  *Pl.'s Mot. for Partial Summ. J.* (Docket # 30).  The magistrate judge again recommended that the Court grant this motion and, again, without objection from the United States, the Court affirmed the recommended decision.  *Report and Recommended Decision* (Docket # 35); *Order on Report and Recommended Decision* (Docket # 36).  The two orders on summary judgment limited

the sole remaining issue for trial to the amount of damages.  *Report of Final Pretrial Conference and Order* (Docket # 42).  *Lovely*, as will be discussed, is critical to the determination of damages.

## II.  STATEMENT OF FACTS

### A.  Mr. Bouchard's General Background

Richard Bouchard is a thirty-nine-year-old native of Caribou, Maine.  He grew up in Caribou, was graduated from Presque Isle High School, and has lived in Aroostook County most of his life.  After his father died when Mr. Bouchard was twelve, he was raised solely by his mother, who had an anxiety disorder and problems with alcohol and prescription medications.  Mr. Bouchard is married and divorced; his one son of the marriage, Brandon, was a passenger in his car at the time of the January 19, 2003 accident.

While in high school, Mr. Bouchard took courses in welding and developed an interest in the field.  At the age of sixteen, he took his first job as a gofer at Soucie Sheet Metal and he eventually began to learn the trade.  After graduation from high school, he obtained a Maine Department of Transportation structural welding certification.  He also received on-the-job training, beginning with basic stick welding, but graduated to more technical work, including welding on high pressure boilers, which he described as highly skilled work, gas metal washing welding, and pressure parts (code) welding.  Mr. Bouchard's career has been devoted to welding for various employers, mostly in Maine and the northeast, but occasionally elsewhere and as far away as southern California.

### B.  Mr. Bouchard's Professional Competence

Mr. Bouchard is a highly skilled welder.  Through his various jobs, he has received considerable on-the-job training and is competent in a number of types of welding.  Mr.

Bouchard testified that many of the companies employ their own testing procedures for potential employees and that passing the test or tests, as the case may be, is a prerequisite to working for that company or on that particular job.  In his entire career, Mr. Bouchard has never failed a welding test.  The fact that many employers repeatedly hired Mr. Bouchard is further testament to his professional aptitude.

### C.  Mr. Bouchard's Status Prior to January 19, 2003

#### 1.  The 1985 Motorcycle Accident and Right Ankle Injury

In 1985, when Mr. Bouchard was seventeen, he was involved in a serious motorcycle accident.  He came upon a pickup truck, heading in the opposite direction.  The pickup slowed down, failed to turn on its blinker and, without warning, turned left, causing Mr. Bouchard to lock the brakes on his motorcycle.  His motorcycle struck the pickup truck and he was thrown back about twenty-five feet, sustaining significant injuries to his right leg.  He broke his fibula and tibia and suffered injuries to his right ankle.  He required a bone graft, and a plate was inserted in his ankle.[2]  Mr. Bouchard recovered well from the fracture to the lower leg, but developed degenerative arthritis in the right ankle, which has caused him ongoing pain and discomfort.

Coincidentally, Dr. John Naranja, Mr. Bouchard's post-January 19, 2003 orthopedic surgeon, examined him on August 7, 2002 for ongoing complaints of pain and instability in the right ankle.  Pl.'s Ex. 1 at 568-570.  Mr. Bouchard complained that "walking will increase his pain" and that he has "instability even when he steps on a small pebble."  *Id.* at 568.  He also complained of "some pressure in the medial aspect of his tibia secondary to some bone in that area."  *Id.*  Dr. Naranja found that Mr. Bouchard had "evidence of a right antalgic gait" and he diagnosed "[c]hronic ankle instability with heterotopic bone

---

[2] This description comes from Mr. Bouchard and is corroborated by subsequent medical histories.

ossification." *Id.* at 570.  He noted that Mr. Bouchard's options included "continued non-operative course of treatment versus operative lateral ankle ligament reconstruction and excision of heterotopic ossification." *Id.*  He thought Mr. Bouchard's symptoms were related both to his "ankle instability" and to his "bony fusion in the tibfib area." *Id.*  Mr. Bouchard told Dr. Naranja that he would check on his insurance and get back to him to possibly schedule these procedures. *Id.*   Mr. Bouchard did not, however, return to see Dr. Naranja before the motor vehicle accident of January 19, 2003 and the contemplated surgery on the ankle and lower leg was not performed.

### 2. Mr. Bouchard's Drug Addiction

Mr. Bouchard has a long and troubled history with drug abuse.  As a result of the pain from the 1985 motorcycle accident, Mr. Bouchard began using and then abusing drugs.  By late 1993, Mr. Bouchard realized he had become addicted to narcotic medication and he openly admits he has been an addict; he also acknowledges previous drug-seeking behavior. For example, on November 13, 1995, Mr. Bouchard presented to the emergency room at Eastern Maine Medical Center (EMMC), complaining of pain and seeking a shot of Demerol. Ex. 101.  The ER physician, however, after reviewing his history, declined to prescribe any narcotics and told him that "he needed to be further evaluated before being given more narcotics . . . ."  Ex. 101 at 2.  On November 11, 1996, Mr. Bouchard again presented to EMMC complaining of facial pain and requesting Vicodin and Lorcet.  The Family Nurse Practitioner did not prescribe any narcotic medications and her secondary assessment was: "Question drug seeking behavior." Ex. 102.  Mr. Bouchard admitted that he would present to a hospital complaining of a migraine headache, receive a shot of Demerol, and then go to a

second hospital, again complaining of pain and seeking medication, but without informing the second hospital of his visit to the first hospital.

Sometime in 1996 or 1997, Mr. Bouchard began intravenous drug use. He stated that, although the majority of the drugs he used in the mid to late 1990s were prescription medications, these drugs were never actually prescribed to him. Rather, he obtained them on the street. For example, Mr. Bouchard further revealed that on one of his welding trips to New Jersey, he purchased and used heroin intravenously because he did not have any pain medication. Mr. Bouchard identified 1997 as his low point. Believing that he was spiraling out of control, on November 23, 1997, he voluntarily sought help from the recovery unit at Mercy Hospital in Portland, Maine, where he remained until discharged on December 3, 1997. By the time Mr. Bouchard went to Mercy Hospital for his first detoxification, he was a long-standing user of opiates and had recently begun using methamphetamine. Mr. Bouchard confessed that his peak drug use was before his first trip to Mercy Hospital, and consisted of a gram of methamphetamine intravenously each day and ten bags of heroin intravenously each week. He recalled the decision to detoxify as difficult, but one he made on his own. Mr. Bouchard testified that he slowly got better, was feeling very good, and was able to stay clean for eight or nine months.

In the fall of 1999, Mr. Bouchard relapsed and on October 22, 1999, he elected to return to Mercy Hospital for a second detoxification, where he remained until his discharge on October 28, 1999.[3] When Mr. Bouchard returned to Mercy Hospital for his second detoxification, the primary issue was Oxycontin. At Mercy Hospital's request, Mr. Bouchard explained his typical day as waking up, doing his morning fix, getting ready for work, using

---

[3] The medical records from the June 14, 2002 Acadia Hospital emergency psychiatric evaluation reveals that Mr. Bouchard left Mercy Hospital early and became very sick with withdrawal symptoms. Def.'s Ex. 114.

all day at work, coming home at night, finding drugs if he didn't already have any, using at night, and going to bed.  Mr. Bouchard testified that his ability to cope with his addiction varied after his second round of detoxification.  When he was not working, he stated he seemed better able to stay away from drugs; however, after he returned to work, within a couple of weeks, he would be on the streets seeking drugs.

According to the medical records, Mr. Bouchard continued to struggle after he left Mercy Hospital's program.[4]  He used drugs on and off in 2000, continually trying to stay clean.  His employment suffered.  He had some teeth pulled and was placed on Vicoprofen and was also placed on Oxycodone for pain.  He was again using methamphetamine intravenously and began to self-medicate with methadone he obtained from the street.  Just before his 2002 admission to Acadia Hospital, he had been taking Ativan, Vicoprofen, and getting Roxicodone off the streets.

Mr. Bouchard had a third detoxification in June 2002 at Acadia Hospital in Bangor, Maine.  His Caribou physician, Dr. Korkut, made the referral to Acadia and Mr. Bouchard presented himself there on June 18, 2002.  Mr. Bouchard testified that his doctor at Acadia explained to him that his drug-seeking behavior was likely the result of his ankle injury: the more Mr. Bouchard was on his ankle at work, stressing the previous injury, the more his mind reacted with the desire to self-medicate.  His doctor at Acadia discussed with him the possibility of methadone treatment.[5]  The second day of the program he received news that there had been a big drug bust in Aroostook County; he was worried that his girlfriend might be in trouble and expressed his desire to leave.  The Acadia records reflect that Mr. Bouchard lasted only four days and discharged himself against medical advice.

---

[4] This intervening history is taken from the emergency psychiatric evaluation of June 14, 2002.  Def.'s Ex. 114.

[5] Mr. Bouchard's memory of what his doctor at Acadia said to him is not reflected in the intake and discharge summaries, which are the only admitted records of his treatment at Acadia.

There is a records gap between August 7, 2002, when Mr. Bouchard was seen by Dr. Naranja, and January 19, 2003, when the accident occurred; however, this gap is largely filled in by the testimony of Dr. David Conner, M.D.  Dr. Conner is a family practitioner in Caribou, Maine and has been Mr. Bouchard's primary care physician since October 24, 2002.[6]  Dr. Conner's initial history on that date revealed that Mr. Bouchard's issues included "[h]istory of hepatitis C, history of IV abuse, had an accident in 1985, and has plates in his right ankle, and having a lot of pain with that.  He'd been on methadone for this.  And that does seem to help him." *Def.'s* Ex. 184, *Trial Dep. of David Conner dated April 11, 2007* at 5 (*Conner Dep.*).  Dr. Conner stated that the methadone had "been started in one of the pain clinics." *Id.*  Mr. Bouchard's prior physician, Dr. Korkut, "didn't feel comfortable with his medication with his history" and Mr. Bouchard had come to Dr. Conner, asking him to take over his primary care, including "continuing on this medication for him." *Id.* at 6.  Although Dr. Conner stated that methadone can be prescribed for both chronic pain and drug addiction, he does not "have the license to use methadone for addiction." *Id.* at 8.  But, he acknowledged that the methadone – which he was prescribing for chronic pain – "was helping [the narcotic addiction] too." *Id.*

Dr. Conner said that Mr. Bouchard's most important medical issue on October 24, 2002 was his hepatitis C. *Id.* at 9.  He said that people with hepatitis C "don't do well with that long term usually."  *Id.*  The other medical problems included addiction and chronic pain. *Id.*  Mr. Bouchard returned to Dr. Conner on November 22, 2002 for unrelated reasons; Dr. Conner confirmed that he prescribed 15 milligrams of methadone three times per day.  *Id.* at 13-14.  The last time Dr. Conner saw Mr. Bouchard before the accident was December 30,

---

[6] Dr. Conner testified by written deposition on April 11, 2007, and the transcript was admitted into evidence as Exhibit 184.  The references are to pages in the deposition transcript.

2002.  *Id.* at 15.   Mr. Bouchard complained of "having more pain."  *Id.*   Dr. Conner prescribed a higher dose of methadone – 10 milligrams, 4 times per day – and started him on a non-steroidal anti-inflammatory drug (NSAID) called Arthrotec.  *Id.*

According to Mr. Bouchard, he was employed – as required by the methadone program – full-time at Del's Welding.  Mr. Bouchard testified that he was doing fine on the methadone program in the month preceding the accident.  Brandon Bouchard corroborated this testimony, stating that his father's drug abuse problems were the worst between 1996 and 1998.  During much of that period, his mother did not allow him to see his father.  Just before the accident, however, Brandon thought his father was doing pretty well.[7]

### 3.  Mr. Bouchard's Employment History

Shortly after graduating from high school in 1987, Mr. Bouchard began working for Cianbro Corporation and he worked on a variety of projects during the year he was employed by Cianbro.  During that year, he worked throughout the state of Maine, including Westbrook in southern Maine, Lincoln and Millinocket in north central Maine, and Fort Fairfield in northern Maine.  After leaving Cianbro in October 1988, Mr. Bouchard went to work for a refrigeration contractor at Penobscot Frozen Foods in Washburn, Maine in Aroostook County.  He estimated that he spent three months on the refrigeration project.  At some point, Mr. Bouchard's brother, Dwayne, finished his employment with Soucie Welding and started his own company "Bouchard Sheet Metal Welding."  Mr. Bouchard worked for his brother between late 1988 and mid-summer 1989.

Between the late summer and the fall of 1989, Mr. Bouchard worked for the Alabama-based company, BE&K Construction, at the International Paper mill in the western

---

[7] The car involved in the accident was supposed to be Brandon's first car:  the pair had dug the car out of the snow and were on the way to the gas station to begin fixing it up when they were hit by the Border Patrol agent.

Maine town of Jay.  He then went to Maine Energy Systems to work on a power plant in Lewiston, Maine and remained there until January or February of 1990.

Mr. Bouchard next went to work for the Holden Company.  While with the Holden Company, he worked on a number of jobs, including jobs at Loring Air Force Base in Limestone, Maine, in Winterport, Maine, Logan Airport in Boston, Massachusetts, and the naval base station in Kittery, Maine.  He began with Holden in the spring of 1990 and ultimately left sometime in the late summer of 1992.  There was a brief lapse in his employment with the Holden Company in the late fall of 1991, after Mr. Bouchard had finished working at Logan Airport and before beginning work at the naval base in Kittery; during the interim, he went to work for Del's Welding & Fabrication (Del's) in Caribou on a refrigeration job.

After leaving the Holden Company, Mr. Bouchard worked for L&M Plumbing and Heating (L&M) at McCain foods in Easton, Maine for a few weeks but then went to Zurn-Nepco in Ashland, Maine, where he remained until March 1993.  He then went to work at NIC in Berlin, New Hampshire on a paper mill.  About a month and a half later, however, Mr. Bouchard left the New Hampshire project for a higher paying job through G&C Enterprises (G&C) at the Air National Guard Base in Bangor, Maine.  After completing the work in Bangor, Mr. Bouchard stayed on with G&C to do a project at the McGuire Air Force Base in Wrightstown, New Jersey.  His work with G&C ended around February 1995.

Mr. Bouchard then returned to New Hampshire, this time to work for Structural Associates on a shutdown at the Pease Air Force Base in Newington.  This job ended sometime in the fall of 1995.  Also that fall, the Vice President of G&C, who had opened up

a sister company, Eagle Construction, requested Mr. Bouchard's assistance for a sixteen-day project in Lakehurst, New Jersey.

The following spring – spring of 1996 – Mr. Bouchard was back in Maine working at International Paper in Jay, this time for a local company called BMW. When this work ended, in the late summer of 1996, Mr. Bouchard returned to work for L&M at McCain's in Easton. He stayed with L&M until the spring of 1997.

Mr. Bouchard then received a call from the refrigeration company he worked for on the Penobscot Frozen Foods plant. This time, the job was in Mars Hill, Maine and it lasted until the fall of 1997. While working in Mars Hill, Mr. Bouchard twisted his ankle and was out on worker's compensation for several weeks. Although Mr. Bouchard returned to work for BMW for a short while that winter, he ultimately decided to take some time off from welding. He had been in touch with a family friend who did home construction and roofing and he went to work for him until the summer of 1998.

Mr. Bouchard returned to welding in the fall of 1998 when he went back to work for L&M at McCain's foods in Easton; he remained there until the fall of 1999. In January 2000, the Saxon Group hired Mr. Bouchard to work in Veazie, Maine. He left the Saxon Group in late March 2000 and went to work for Maine Pipers, which was looking for people to maintain some power plants in California. Mr. Bouchard first worked on a shutdown of a power plant in southern California, then flew to Sunnyside, Utah and worked on a shutdown there, and then flew back to southern California to work on a power plant beside the first one. He flew back to Maine in April 2000 to work for a couple of weeks on a shutdown in Millinocket, Maine.

He then went back to work for L&M for the summer of 2000.  During the fall, Mr. Bouchard worked on a water tower at the old Loring Air Force Base.   While working on the water tower, Mr. Bouchard came across someone with whom he had previously worked at the Holden Company and he went to work for him for various jobs through December 2001.

Beginning in 2002, Mr. Bouchard went back to work for Del's.  He worked on a number of jobs with Del's, including one at Mars Hill and one at McCain's in Easton.  When Del's had a lull in its workload, Mr. Bouchard was laid off and, as a result, went back to L&M.  Soon after, however, Del's received more work and called Mr. Bouchard.  He began working for Del's again in the fall of 2002 and worked up until two days prior to the accident in 2003.[8]

### 4.  The Physical Demands of Welding

Mr. Bouchard testified about the physical demands of welding.   Although the physical demands of a welding job depend on the circumstances of that job, Mr. Bouchard testified to a number of welding scenarios and the corresponding physical requirements.  One standard requirement is the presence of a welding machine.  However, since it is impractical to move the machine for each weld, the welders frequently have to carry welding leads which run between themselves and the welding machine.   The leads are copper wires with protective coating and are approximately an inch in diameter.  The location of the welding machine relative to the job determines the length of the welding lead the welder is required to carry, but, often times, the welder may need to carry a hundred feet of lead with him.

---

[8] Brandon Bouchard testified that prior to the accident, Mr. Bouchard was teaching Brandon how to weld and the plan was to begin their own welding business when Brandon graduated from high school.  He stated that since the accident, his father has been depressed and going down hill.  Brandon noted that welding had been his father's whole life.

Mr. Bouchard further testified that he was routinely required to climb ladders and scaffolding, and has previously been required to construct his own scaffolding. He stated that balance was critical to his job; he regularly worked at significant heights and had to walk along steel beams. He also stated that about ninety to ninety-five per cent of the time, he had to crouch or kneel to get into the proper position to perform a weld. Finally, Mr. Bouchard kept quite rigorous working hours. He explained that he worked eight hours a day at the bare minimum, and more typically, he worked a lot of overtime. Frequently, he worked seven days a week for twelve hours each day.

### 5. Mr. Bouchard's Prior Criminal Record

In May 1993, Mr. Bouchard was charged with reckless conduct, later found guilty, and served seven days incarceration. In March 1995, Mr. Bouchard was charged with misdemeanor assault, found guilty, and received a suspended sixty day sentence with probation for one year. In August 1995, he was charged with violating the conditions of his probation and, in April 1996, he was found guilty and sentenced to 48 hours in jail, all suspended. In December 1995, he was charged with violating a protective order and was found guilty and fined $100.00. Also in December 1995, he committed the offense of theft by deception and paid restitution of $785.00. In February 1996, he was charged with disorderly conduct and criminal mischief and, after being found guilty in April 1996, he was incarcerated for thirty-one days and paid $160.00 in restitution. Also in February 1996, he was charged with misdemeanor assault and in April 1996, when he was sentenced for the disorderly conduct and criminal mischief, he was sentenced to a concurrent term of thirty-one days incarceration. In November, 1996, he committed the misdemeanor offense of theft of services and after being found guilty, paid a fine of $200. In April 1999, Mr. Bouchard was

13

charged with, and in November 2000 found guilty of, felony assault.  He was sentenced to one year in jail, all but sixty days suspended.  He was released from prison in early 2001. His criminal record reflects these misdemeanor and felony convictions.

### D.  The Accident and Its Aftermath

#### 1.  The Accident

It was snowing and dark on January 19, 2003, when Mr. Bouchard and his son Brandon headed north on Route 1 in a 1991 Dodge Daytona.  Mr. Bouchard was driving and Brandon was in the front passenger seat.  The roads were very, very slippery and there was a lot of snow and slush.  As they proceeded down a hill, Mr. Bouchard noticed headlights coming up the hill, but veering all over the place.  Mr. Bouchard assumed the vehicle was out of control and then it disappeared in snow dust.  When it reappeared, the vehicle was heading directly toward his car.  Mr. Bouchard tried to pull into a ditch, but the other vehicle struck his car on the driver's side.

Mr. Bouchard's air bag exploded, but he could still feel the motor and dashboard coming toward him.  The steering wheel broke and he was pushed toward his son in the passenger seat.  After the vehicle came to rest, the dashboard had pinned his legs against the seat.  Mr. Bouchard could not move and after the rescue crew came to the scene, they were forced to use the jaws of life to extract him from the vehicle.

After about fifty minutes, they removed Mr. Bouchard and began the trip by ambulance to The Aroostook Medical Center (TAMC) in Presque Isle.  After a stopover at TAMC, it was determined that he had to be transferred to EMMC in Bangor and he was transported there by ambulance.  Mr. Bouchard was medicated for the long ride to Bangor,

and an ambulance attendant gave him periodic injections of morphine.  He was admitted to EMMC and underwent surgery.

### 2.  Treatment at EMMC

Mr. Bouchard arrived at EMMC at about 1:30 a.m. on January 20, 2003.  The intake history states he was complaining of pain in both legs and in his right arm.  He was transferred to the orthopedic service under the care of Dr. Richard Bower and Dr. Bower performed a closed reduction and external fixation of the right distal radius, a retrograde nailing of a fracture of the right distal femur, and an antegrade nailing of a subtrochanteric fracture of the left femur.  Upon discharge on January 24, 2003, he carried the following diagnoses:  (1) fracture, right distal radius; (2) fracture, right distal femur; (3) fracture, left proximal femur; and, (4) recovering narcotic addiction on methadone.  Upon his discharge on January 24, 2003 to rehabilitation in Presque Isle, Dr. Bower commented that he "got off to a good start with physical therapy here" and his prognosis was "[g]ood for eventual healing." Pl.'s Ex. 1 at 317.

### 3.  January 24, 2003 – September 10, 2003

After Mr. Bouchard arrived back in Aroostook County, he was examined by Dr. Stephen Wood, who gave an optimistic assessment:  "This unfortunate man, hopefully, will completely recover from these fractures."  Pl.'s Ex. 1 at 26.  Dr. Wood recommended a course of physical therapy, which Mr. Bouchard undertook.  However, Mr. Bouchard did not make satisfactory progress and, on September 10, 2003, he returned to see Dr. Naranja, the orthopedic surgeon who had seen him about a year before in response to his ankle complaints.

### 4.  Dr. Naranja's Treatment:  September 20, 2003 to Present

When Mr. Bouchard returned to Dr. Naranja, his major complaint was restrictive motion of his right knee.  His range of motion was only 10 to 30 degrees; normal is 150.  Dr. Naranja thought that some of the hardware that was still in the knee should be removed and that, at the same time, it would be worthwhile trying lysis of the adhesions.  Pl.'s Ex. 1 at 550.  Dr. Naranja performed this operation on October 10, 2003 at the Northern Maine Medical Center (NMMC) in Fort Kent, Maine.  *Id.* at 520-29.  The surgical note reveals that Mr. Bouchard's range of motion post-surgery had increased to 120 degrees of flexion.  *Id.* at 520.  According to Dr. Naranja's notes, Mr. Bouchard continued to progress after the October 2003 surgery and by March 4, 2004, Mr. Bouchard reported that his range of motion was "much better than it was preoperatively," but he still had "some areas in the incision that will occasionally open up."  *Id.* at 554.  Dr. Naranja thought he had developed some bursitis of the greater trochanter and he gave him a Cortisone injection.  *Id.*   When he was seen on June 2, 2004, Dr. Naranja tested his range of motion at 120 degrees, but noted some quadriceps atrophy and ankle instability.  *Id.* at 555.  He recommended physical therapy.  *Id.*

As of July 7, 2004, Mr. Bouchard was complaining that the rod that Dr. Bower had installed was moving around and he had stopped his physical therapy.  *Id.* at 556.  Dr. Naranja thought the rods should be removed and he scheduled another round of surgery for October 8, 2004, again at NMMC.  *Id.* at 530-35.  Notwithstanding the second surgery, by February 24, 2005, Mr. Bouchard was still in "a significant amount of pain."  *Id.* at 565.  He was experiencing "quite a bit of crepitus with his [range of motion] and he has difficulty

walking any distance." *Id.*  The decision was made to proceed with a total knee replacement. *Id.*

On April 11, 2005, Mr. Bouchard was readmitted to the NMMC for a total knee replacement. *Id.* at 1375. By November 2, 2005, Dr. Naranja's physician's assistant writes that "[e]verything seems to be going well." *Id*. at 896.  He recommended physical therapy. By December 14, 2005, however, Dr. Naranja writes:  "The patient is doing fairly well with regard to his [range of motion], but he has quite a bit of deconditioning as is expected after his multiple surgeries.  Given his chronic deconditioning and the fact that he has a knee replacement with limited longevity, I would recommend that he be placed on a no work capacity to try and preserve the longevity of his knee."  *Id.* at 897.  By April 19, 2006, Dr. Naranja notes that Mr. Bouchard had been swimming 3 to 5 times per week and had noted less quadriceps atrophy; he told him to "continue with his activities as tolerated . . . ."  *Id.* at 899.

Dr. Naranja last saw Mr. Bouchard on November 2, 2006.  *Id.* at 1374.  At that point, Mr. Bouchard was also complaining of right wrist pain, which Dr. Naranja injected with Cortisone.  *Id.*   In addition, he complained of "sloppiness" in the right knee.  *Id.*   Dr. Naranja's physical examination of the right knee revealed "full [range of motion] and incisions are well-healed."  *Id.*  He was concerned, however, about atrophy in his right leg and recommended some Biodex testing to compare the right and left legs.

### 5.  Dr. Conner's Treatment After January 19, 2003

Dr. Conner has continued to act as Mr. Bouchard's primary care physician since January 19, 2003.  After the accident, Dr. Conner increased Mr. Bouchard's dosage of methadone from one ten milligram tablet, four times per day – or about 120 tablets per month

– to three ten milligram tablets, four times per day – or about 360 tablets per months, a three-fold increase in his methadone dosage. *Conner Dep.* at 60-61. By the end of 2003, Mr. Bouchard's methadone dosage was increased fivefold to 50 milligrams, four times per day – or about 600 tablets per month. *Id.* at 62. According to Dr. Conner, chronic pain was the reason for these higher dosage levels. *Id.* at 62. Even at these increased levels, methadone was not successful in managing Mr. Bouchard's level of pain, and after each surgery, he "seemed to be worse." *Id.* at 63, 74.

In the fall of 2006, concerned about the fact he had not improved, Dr. Conner concluded that he "needed to start finding other pain medications to treat his pain." *Id.* at 16. He decided to wean him from methadone. In December 2006, Dr. Conner replaced methadone with a new drug, Suboxone, which the doctor described as a "good solution" for people like Mr. Bouchard. *Id.* at 16-21. Suboxone has eliminated Mr. Bouchard's "craving for narcotics" but it is "[n]ot treating his pain as well." *Id.* at 22. Dr. Conner tried other medications to address the pain, including Cytotec, Lyrica, Cymbalta, and Amitriptyline. *Id.* at 22-23. When the doctor last saw Mr. Bouchard, he had just started Lyrica and he agreed that "the jury's still out" on the effects of non-narcotic pain medications. *Id.* at 75. Thus far, Dr. Conner's efforts to help Mr. Bouchard address his chronic pain have been largely unsuccessful and he testified that Mr. Bouchard's prognosis "doesn't look too good at this point." *Id.* at 84. He agreed that Mr. Bouchard would need "some type of medical care or treatment for managing his injuries and pain for the rest of his life." *Id.*

### 6.  Mr. Bouchard's Current, Non-Employment Physical Abilities

In the summer of 2006, Mr. Bouchard was able to engage in some outdoor activities with friends. His activities included joining his friends while they were out camping at

various locales in Maine (although he would not spend the night), attending August Fest, going to a smash-up derby, visiting Portage lake, and picking raspberries and strawberries. He had also gotten into and out of boats on at least a few occasions and was able to do a little bit of fishing.

His son, however, testified to a dramatic difference between his father's pre- and post-accident activity level.  According to Brandon, his father bought him ATVs and snowmobiles when Brandon was younger and the two used to ride together a great deal; now, Mr. Bouchard does not get on a four-wheeler or snowmobile.  When they are boating or fishing, something they used to do regularly, Mr. Bouchard seems uncomfortable all the time and often wants to go home early.

In terms of household maintenance, because of his father's limitations, Brandon has assumed many of the duties his father used to do.  Brandon testified that he has to cut and split wood and do all the cleaning.  Similarly, Brandon stated that his father cannot sit in one place for too long, cannot drive in a car for too long – when they go on car rides they frequently have to pull over for Mr. Bouchard to get out and walk around – and that his father does not seem to trust the stability of his artificial knee and avoids ladders.

### 7.  Mr. Bouchard's Post Accident Drug Addiction

Mr. Bouchard's drug-seeking behavior has continued since the accident.  In July 2003, Mr. Bouchard presented at Cary Medical Center's emergency department where he complained of an inability to sleep and withdrawal problems with methadone, told hospital personnel that he was concerned about drug enforcement agents, and then refused voluntary admission.  The following month, Mr. Bouchard drove from Caribou to Bangor and went to

EMMC's emergency department complaining of pain and seeking medication.[9]   The emergency room doctors refused to prescribe any more pain medication because Mr. Bouchard admitted that his prescribing physician was refusing to give him more medication; EMMC personnel thought it prudent to follow the same course of action.

In July 2004, Mr. Bouchard went to Cary Medical Center's emergency department. On this occasion, he was being treated after a low-speed roll-over in his car.  While Mr. Bouchard did not immediately experience any pain after exiting his car through a side window, he soon developed shoulder pain and was taken to the emergency department at that point.

On October 12, 2004, Mr. Bouchard returned to Cary Medical Center, this time to have a leg dressing changed.  While he was there, although he was not experiencing any particular discomfort, Mr. Bouchard asked the physician if he would write a prescription for pain medication.  Mr. Bouchard testified that, at that time, he was thinking about getting off of methadone and would need a pain medication in lieu of methadone.  On October 17, 2004, Mr. Bouchard again went to Cary Medical Center.  He requested additional pain medication, but was refused as he was already taking both Percocet and methadone.

In December 2004, Mr. Bouchard presented at Cary Medical Center expressing that he had a tooth ache and asking the physician to examine his right knee.  He requested, and received, a short-term prescription for oxycodone.

---

[9] Mr. Bouchard explained that he drove to Bangor because his then-fiancee's ex-boyfriend had been in a car accident and had been transported to Bangor.  They had come to give him support and Mr. Bouchard's knee was in pain from sitting in the car for such a long ride; by the time he arrived in Bangor, he needed pain medication.

Finally, in December 2005, Mr. Bouchard was found asleep in his car on the side of the road in Caribou.[10] Mr. Bouchard testified that he was visiting friends that night and that it was approximately a mile between his friends' house to where his car was parked. He explained that one reason he fell asleep was because he was tired and his knee was bothering him. Additionally, he admitted he had also taken methadone for his knee, Sudafed for his sinuses, and some Benadryl.

## III.  TRIAL ISSUES

The parties agree generally to how the accident occurred and the medical procedures Mr. Bouchard underwent following the accident. They substantially disagree, however, on Mr. Bouchard's earning capacity and the impact of his injuries on his earning capacity. Each party took a "tiered" approach to the presentation of expert testimony. Mr. Bouchard introduced the medical testimony of Dr. Naranja, who gave his opinion on appropriate physical restrictions for Mr. Bouchard. Next, he introduced the testimony of vocational rehabilitation counselor Jack Bopp, who expressed his opinion on Mr. Bouchard's employment potential, given Dr. Naranja's recommended restrictions. Finally, Mr. Bouchard introduced the testimony of economist Dr. Alan Stewart McCausland, who testified about Mr. Bouchard's earnings potential, given Mr. Bopp's opinion on Mr. Bouchard's employment opportunities.

---

[10] During Dr. Conner's trial deposition on April 11, 2007, Dr. Conner testified that Mr. Bouchard attempted suicide on December 5, 2006. *Conner Dep.* at 45. On April 12, 2007, the United States moved *in limine* to preclude the Plaintiff from introducing evidence of the suicide at trial. *Def.'s Mot. in Limine* (Docket # 60), because the information about the suicide attempt had not previously been disclosed. The Plaintiff objected. *Pl.'s Obj., in Part, to Def.'s Mot. in Limine* (Docket # 61). Mr. Bouchard objected only insofar as the motion sought to preclude Dr. Conner's testimony on the issue. At the beginning of trial on April 17, 2007, the Court heard argument on the motion *in limine*. Mr. Bouchard clarified that he "never intended to claim the suicide as part of the damages arising out of the car accident. Once Mr. Bouchard made this clarification, the relevance of the suicide attempt became attenuated and the Court granted the motion *in limine*, based on the Plaintiff's discovery violation and its lack of relevance. *Oral Order* (Docket # 64).

In response, the United States introduced the medical testimony of orthopedic surgeon Dr. James Bono, who gave his opinion on appropriate physical restrictions for Mr. Bouchard.  Similarly, the United States introduced the testimony of vocational rehabilitation counselor Ms. Eileen Kalikow, who expressed her opinion on Mr. Bouchard's employment potential, given the recommended physical restrictions.  Although the United States did not call its own economist, it pointed out asserted flaws in Dr. McCausland's reasoning.    In addition, the United States cross-examined Mr. Bouchard extensively on his pre- and post-accident addictive behavior in an effort to demonstrate that his addictions negatively affect his earning capacity.

**A.  The Medical Experts**

**1.  Dr. John Naranja**

**a.  The Total Knee Replacement and Mr. Bouchard's Prognosis**

Dr. Naranja described the seriousness of a total knee replacement.  He explained that the surgery requires opening up the knee joint, and from there, the surgeon shaves off the areas of arthritis on the three bones which comprise the knee joint – the femur, the tibia, and the patella – and replaces the joint with metal and plastic.  The artificial knee differs markedly from a normal human knee joint.  Patients experience a different sensation of feeling and space because there are no nerve endings on the metal and plastic.  As a result, they may put more force on the knee than they would with a normal knee, which could presumably feel that it was being overexerted.  In addition, an artificial knee frequently affects the surrounding muscles and atrophy is common.  This often upsets the ability to balance, alters gait, and may disrupt other areas of the body because those joints or muscles compensate for the shift in muscular function.

Dr. Naranja testified that Mr. Bouchard was quite young to undergo a total knee replacement, as they are typically recommended in patients sixty-five years old or older. This is because the knee replacements have a limited longevity.  Dr. Naranja stated that in patients sixty-five or older, the replacements last anywhere from ten to twenty years, but that the longevity significantly decreases in younger patients.  He opined that this may be due to increased activity levels at a younger age, or the bones being at a different stage; he asserted that, whatever the reason, knee replacements in younger patients have a much shorter duration.

Given Mr. Bouchard's circumstances, Dr. Naranja recommended that Mr. Bouchard be placed on "no work" capacity to try to preserve the longevity of the knee.  Dr. Naranja testified that preservation is critically important because, in the future, Mr. Bouchard may require revisions and, at some point, there may not be a sufficient amount of bone remaining to affix another knee replacement.  As such, Mr. Bouchard's options would then become limited to either a fusion of the bones or no knee at all.   Dr. Naranja affirmed that the likelihood of reaching that point increases with the more activity and stress that the patient places on the knee.  Dr. Naranja estimated that Mr. Bouchard would need to have his knee replaced again in ten to twelve years.  Because his estimate is based on data from a significantly older age group, Dr. Naranja used the lower end of the timeline.  He also stated that subsequent knee replacements would need to occur every ten years thereafter, explaining that each subsequent knee replacement has further reduced longevity.

### b.  Dr. Naranja's Recommended Physical Restrictions

Largely to enhance the longevity of Mr. Bouchard's total knee replacement, Dr. Naranja imposed substantial restrictions on his physical activity.  As earlier noted, he placed

him on "a no work capacity."  Pl.'s Ex. 1 at 897.  In Dr. Naranja's opinion, Mr. Bouchard may sit for up to two hours, stand or walk for up to one hour, or drive for up to two hours, all continuously and without a break.  Within a full eight-hour day, Mr. Bouchard may sit for up to four hours, stand and walk for up to four hours, and drive for up to four hours, but would need to take periodic breaks.

Dr. Naranja imposed lifting restrictions on Mr. Bouchard, stating that heavy lifting would decrease the longevity of the knee.  Mr. Bouchard may frequently lift up to ten and twenty pounds.  If he is feeling particularly good, he may occasionally lift weights over twenty pounds.  If, however, he is experiencing any general discomfort with his knee, he should refrain entirely from lifting over twenty pounds.

Mr. Bouchard should never climb or balance.  Dr. Naranja explained that in addition to the stress on the knee, these activities present safety concerns since, given the absence of nerves, the sensation of balance in an artificial knee is not what it would be in a normal knee. Similarly, Dr. Naranja recommended that Mr. Bouchard's physical restrictions include no kneeling, lifting, crouching, squatting, or any activities that place increased force around the knee.   On the other hand, Mr. Bouchard is able to engage in upper body activities, such as reaching, handling, and fingering, without restriction.

Based on his recommended physical restrictions, Dr. Naranja testified that it would not be appropriate for Mr. Bouchard to return to his previous career as a welder.  Moreover, in light of the anticipated future knee replacements, Dr. Naranja maintained that Mr. Bouchard would likely be disabled from the competitive work force between the age of forty-five and fifty.

On cross-examination of Dr. Naranja, the Government brought out a number of positive signs. Dr. Naranja agreed that a bone scan had showed no sign of loosening or suspected wear of the artificial knee joint and that Mr. Bouchard was maintaining a good range of motion. He was continuing with conditioning and strength work. As of April 2006, Mr. Bouchard's flexion was zero to 120. By July 2006, the incision was well-healed and he no longer had any significant pain. The knee was stable, he was able to walk, and he was not using a brace, crutches, or a cane. Moreover, Mr. Bouchard was able to climb some stairs because he was required to do so as part of his physical therapy regime.

As a final matter, the Government noted that Dr. Naranja had recommended that Mr. Bouchard go to County Physical Therapy. Dr. Naranja was unaware, however, that Mr. Bouchard had cancelled six straight appointments with County Physical Therapy. He was further unaware that County Physical Therapy had come to the conclusion that Mr. Bouchard had potential for improvement, but that he did not have a very good understanding of what was needed to improve his physical abilities. Finally, unbeknownst to Dr. Naranja, County Physical Therapy had been unable to get in touch with Mr. Bouchard.

### 2. Dr. James Bono

The United States' medical expert was Dr. James Bono, also an orthopedic surgeon. Dr. Bono's orthopedic practice is limited to hip and knee surgery and he has performed more than 1,600 total knee replacements over the past twelve years. To prepare Dr. Bono for trial, the United States provided him with Dr. Naranja's medical records, Dr. Naranja's deposition transcript, Mr. Bopp's vocational rehabilitation report, and some notes from conversations between Dr. Naranja and Mr. Bopp. Dr. Bono testified that, in his medical opinion, the total knee replacement was medically appropriate.

Dr. Bono explained the AMA Permanent Impairment Guidelines, stating that they quantify the disability resulting from an injury. They are formulaic: they enable one to insert certain values and calculate an impairment rating based on a provided formula. Applying the Guidelines to Mr. Bouchard, Dr. Bono found that he had a thirty-seven percent lower extremity impairment of the right leg and a fifteen percent whole person impairment.

Like Dr. Naranja, Dr. Bono concluded that Mr. Bouchard should be entirely restricted from climbing, kneeling, crouching, crawling or balancing. The doctors further agreed that within the course of an eight-hour day, Mr. Bouchard should not stand or walk more than four hours without a break and that he should not drive more than four hours without a break.

Dr. Bono's other recommended restrictions were less restrictive than Dr. Naranja's by a factor of two. Mr. Bouchard should not lift anything greater than forty pounds;[11] he should not sit more than four hours without a break; he should not stand or walk for more than two hours without a break: he should not drive for more than four hours without a break; and, within the course of an eight-hour day, he should not sit for more than eight hours at a time.

Dr. Bono testified that artificial knees last anywhere from fifteen to twenty years, depending on age, activity, weight, lifestyle, and occupation. He believed that Mr. Bouchard's knee would last between fifteen and twenty years if he stayed within the imposed physical restrictions. He analogized the longevity of a knee replacement to the longevity of a car, saying that, either's longevity depends on how well it is maintained. He stated that a patient has to take care of the artificial knee, not overuse it, and not overload it. As such, Dr. Bono stated that he has never – over the course of the last twelve years and over 1,600 knee replacement surgeries – recommended that a patient have no work capacity.

---

[11] Dr. Bono explained that the maximum lifting capacity of forty pounds was really a restriction that should be exercised only occasionally or seldomly. He agreed that it would be inappropriate for Mr. Bouchard to have a job that required him to lift forty pounds on a regular basis.

On cross-examination, however, Dr. Bono admitted that he had never treated, examined, or even met Mr. Bouchard. Rather, he admitted that his restrictions were consistent with those that he generally places on patients who have artificial knees and that they are not specific to Mr. Bouchard. Dr. Bono further divulged that his estimate of the knee replacement lasting between fifteen and twenty years is based on a statistical average and he agreed that it was quite uncommon for someone Mr. Bouchard's age to have a total knee replacement. Of the over 1,600 knee replacement surgeries Dr. Bono had performed in his career, fewer than ten involved patients in their thirties. Dr. Bono acknowledged that total knee replacements on patients in their thirties represent approximately one half of one percent of the statistical pool. Finally, Dr. Bono agreed that, since Mr. Bouchard's job as a welder required heavy lifting, he should not return to that line of work.

### B. The Vocational Experts

#### 1. Jack Bopp

Mr. Bouchard presented the expert testimony of vocational rehabilitation counselor, Jack Bopp, whom he retained to analyze his post-injury vocational abilities and earning capacity. Under the name of Rehabilitation Services Associates, Mr. Bopp provides counseling and consulting services in the area of disability to the legal community. Mr. Bopp has experience placing people with disabilities in jobs and has direct experience working with welders.

Mr. Bopp met with Mr. Bouchard for an initial rehabilitation interview in July 2005 and has since spoken with him by telephone on many occasions. As part of his evaluation, Mr. Bopp reviewed Mr. Bouchard's medical records, his social history, including his family background, criminal history, and history of drug dependency, his educational history,

including his recent aptitude tests for vocational testing, and Mr. Bouchard's entire employment history beginning when he left high school through the accident; Mr. Bopp is further aware of Mr. Bouchard's professional qualifications, experience and certifications in welding.

More generally, Mr. Bopp familiarized himself with the physical requirements and hazards of Mr. Bouchard's jobs. He testified that welding is a hazardous trade and one which requires significant exertion at the medium and heavy levels, as defined by the United States Department of Labor (DOL).[12]   According to DOL definitions, medium exertion means being on one's feet for at least six of eight hours a day, lifting up to fifty pounds, and frequently lifting about twenty-five pounds. Heavy exertion means frequently lifting fifty pounds and occasionally – meaning up to one-third of the day – lifting up to one hundred pounds. Heavy exertion also includes occasional crouching, stooping, and kneeling.

Mr. Bopp reviewed the work restrictions recommended by both Dr. Naranja and Dr. Bono and, under either set of restrictions, he concluded that Mr. Bouchard has lost his physical capacity to return to welding. Mr. Bopp explained that, although Mr. Bouchard still maintains his knowledge, he is no longer employable as a welder, because he cannot meet the physical demands of the occupation. Mr. Bopp noted that the prospects for a highly skilled welder in Maine – someone like Mr. Bouchard – were quite good:  demand for workers and, therefore, their wages have remained high.

---

[12] Mr. Bopp explained that the DOL publishes the Dictionary of Occupational Titles (DOT) and corresponding supplements. In these publications, the DOL publishes detailed information about all of the occupations in the United States economy, both in terms of tasks that are performed by people in that occupation as well as the average levels of abilities, aptitudes, and physical capacities necessary to perform those occupations. He stated that the DOT was the most studied and published source of occupational information and one on which vocational counselors frequently rely.

Mr. Bopp's used the REPEL methodology to arrive at his conclusions.   REPEL is an acronym for the different areas a vocational rehabilitation counselor examines:  R stands for Rehabilitation Plan; E stands for employability; P stands for Placeability; E stands for Earning Capacity; and L stands for Labor Force Participation.

### a.  The Recommended Rehabilitation Plan

Mr. Bopp strongly recommended that Mr. Bouchard be provided with vocational rehabilitation services over approximately one year.  Mr. Bopp was aware that Mr. Bouchard had made an attempt to return to school, but stated that educational training was not, in his opinion, the best approach for Mr. Bouchard.  He explained that Mr. Bouchard has not taken college courses or vocational-technical courses since high school and he has no familiarity with computers.  The better approach, according to Mr. Bopp, would be for the vocational rehabilitation counselor to develop a rehabilitation plan to focus on getting Mr. Bouchard the best possible job he is currently able to perform and then troubleshooting any problems that develop in that job.

### b.  Employability

Employability refers to the kinds of jobs the individual is qualified and capable of performing.  If a person is disabled, the inquiry may look to the range of potential jobs he or she may have done before the disability and compare that to the range of potential jobs he or she could compete and qualify for after the disability.

Mr. Bopp testified that the first factor is whether there are related jobs that are less physically demanding into which Mr. Bouchard could transition.  Mr. Bopp concluded that Mr. Bouchard's physical limitations precluded him from performing any related jobs.  He explained that there was an important distinction between skilled and unskilled jobs: skilled

jobs refer to jobs that require at least six months of education or training to perform.  Mr.
Bouchard's background would undoubtedly help him acquire a job as a welding machine
operator or a bench welder, for example, but those are unskilled jobs.  Therefore, Mr. Bopp
maintained that, while Mr. Bouchard's background would make him more competitive for
those jobs, none is going to pay him well.[13]  Mr. Bouchard has no transferable skills for
skilled jobs.  That is, there are no skilled jobs for which Mr. Bouchard could meet the
physical demands.

Nor does Mr. Bouchard's education help him.  At Mr. Bopp's recommendation, Mr.
Bouchard was vocationally and educationally assessed.  His academic skills – math and
language skills – test at the sixth grade level.  His vocational aptitude, or the raw ability to
learn new tasks, tested in the below average to average range.

Ultimately, Mr. Bopp concluded that Mr. Bouchard presented significant
employability problems, given the physical restrictions provided by Dr. Naranja.  He testified
that even in the best case scenario, Mr. Bouchard would be working in unskilled, low-paying
jobs that, even then, would have to be modified to accommodate him.  He further stated that
many employers are inflexible with respect to unskilled jobs when there are potential
employees able to perform the job without accommodations.

### c. Placeability

Placeability refers to how competitive an individual is for the jobs he or she is
qualified to perform.  That is, within the subset of jobs for which one is qualified,
placeability looks to the likelihood that the individual will be hired.  Mr. Bopp testified that,

---

[13] In any event, Mr. Bopp stated that there are approximately fourteen or fifteen bench welding jobs in the
entirety of Aroostook County and on each of two occasions when he checked to see if there were any job
openings, there were not.  Even though Mr. Bouchard would theoretically be competitive for those sorts of
unskilled jobs, the number of jobs available is an insignificant number in the job base and his prospects for
actually getting such a job are very low.

notwithstanding legislative efforts, people with physical disabilities encounter significant obstacles becoming and staying employed. He stated that people with disabilities are unemployed at significantly higher rates than people without disabilities; the more severe the disability, the more unemployment there is; and, when employed, people with disabilities receive lower earnings than those without disabilities.

Beyond his physical limitations, Mr. Bopp stated that Mr. Bouchard's criminal record – namely the felony conviction on his record – as well as his social history would be a placeability obstacle. He noted, however, that these same issues did not appreciably impact his placeability in welding jobs because the population of workers in the welding trade tends to have more of those factors than workers in other labor pools. Of course, Mr. Bouchard also had a skilled trade to market for highly skilled welding jobs, which tended to offset his history.

### d. Earning Capacity

Earning capacity looks to the wages associated with his pre- and post-disability employability. Turning first to Mr. Bouchard's pre-injury earning capacity, and taking into consideration Mr. Bouchard's psychosocial problems, Mr. Bopp concluded that Mr. Bouchard would have been able to earn $12 an hour going forward. Mr. Bopp testified that he paid particularly close attention to Mr. Bouchard's earnings history and observed that there was considerable fluctuation in his earnings history. Although the $12 an hour figure is consistent with what Mr. Bouchard was earning at Del's Welding immediately prior to the accident, Mr. Bopp noted that it still represented a rather conservative estimate because it was lower than both the average wage rate of welders in Maine – at $16 or $17 an hour – and

significantly lower than Mr. Bouchard's own median wage rate over the years he worked as a welder.

As regards Mr. Bouchard's post-injury earning capacity, there are two scenarios:  (1) if Mr. Bouchard has no work capacity, his earning capacity would be zero; and, (2) if Mr. Bouchard could secure a job within the restrictions imposed by Dr. Naranja or Dr. Bono, his earning capacity would be some positive figure.  Mr. Bopp provided a list of jobs potentially suitable for Mr. Bouchard, including dishwasher, dining room and cafeteria attendant, packer, maid and housekeeping cleaner, food preparation worker, laundry and dry cleaning worker, cleaner of vehicles and equipment, stock clerk or order filler, office clerk, and welding, soldering, or production welding machine operator.  However, Mr. Bopp qualified each possibility, saying that, although these jobs are in the "light exertion" range, light exertion can require standing as many as six hours in an eight-hour day, which is beyond Mr. Bouchard's capability of only four hours of standing in an eight-hour day.  Therefore, even these jobs are only potential and the employer would have to make accommodations.

### e.  Labor Force Participation

Labor force participation is another term for work life expectancy.  The inquiry projects how long an individual will be employed in the work force and whether there will be an early separation from the work force due to a disability.  Similarly, it evaluates whether there are going to be longer and/or frequent periods of unemployment because of a disability.

In Mr. Bouchard's case, his psychosocial adjustment difficulties mean that he probably would not work as frequently as an average person of his age, gender and occupational background.  Mr. Bopp posited that he would work at only about seventy-five percent of what would be expected of his demographic group.  The twenty-five percent

reduction in Mr. Bouchard's work life expectancy is in addition to Mr. Bopp's conservative estimate of Mr. Bouchard earning $12 an hour.  Mr. Bopp testified that, although there was a possibility that Mr. Bouchard could earn $15 an hour and have a normal work life expectancy, he opined that within reasonable professional certainty, $12 an hour and a twenty-five percent reduction in work life expectancy were more reliable.

To date, Mr. Bouchard has already lost four years of work life capacity.  Mr. Bopp suggested that, between now and age forty-seven and a half or age forty eight, Mr. Bouchard will lose at least another two years – at the conservative end – of his work life capacity.

On cross-examination, Mr. Bopp acknowledged that there is a relationship between an individual's earning capacity and psychosocial problems.  However, he maintained that, because his estimate already accounted for Mr. Bouchard's history of psychosocial problems, including his struggle with drug addiction, his estimate of Mr. Bouchard's earning capacity and work life expectancy would not change even were Mr. Bouchard's psychosocial problems to intensify.  Mr. Bopp reiterated that twenty-five percent was a conservative estimate, and one based on his own understanding and experience, having worked in the past with people with drug and alcohol problems.  Mr. Bopp further noted that, historically, at the height of Mr. Bouchard's drug abuse and legal difficulties in the late 1990s, he was still earning money at a fairly high level.  He explained that, although Mr. Bouchard's history presents considerable fluctuation in both his drug dependency issues as well as his earnings history, life earning capacity must look long-term.  As such, Mr. Bopp testified his estimate already took into consideration the ebb and flow of Mr. Bouchard's highs and lows and, therefore, his estimates would remain the same even if Mr. Bouchard's drug dependency continued or got worse.

Also on cross-examination, the United States questioned Mr. Bopp about the foundation for some of his assumptions, including any corroboration from various employers about Mr. Bouchard's hourly earnings, the number of hours he worked, and any other fringe benefits. Other than information provided by Del's Welding, Mr. Bopp did not have documentation from Mr. Bouchard's employers confirming, for example, how much he made, the hourly rate, the number of hours he worked, or whether he had been given fringe benefits. Rather, he had relied on the information Mr. Bouchard provided him.

Finally, the Government explored the numbers of hours typically worked by welders in a given year. Mr. Bopp testified at trial that it is frequently between 1600 and 1800 hours each year, although some work as many as 2080. The Government pointed out both that, at his deposition, Mr. Bopp had stated that welders typically worked 1800 hours each year, and that, in the two years just prior to the accident, 2001 and 2002, Mr. Bouchard had worked only 1500 and 1000 hours per year, respectively.

### 2. Ms. Eileen Kalikow

In rebuttal, the United States presented the testimony of Ms. Eileen Kalikow as its vocational rehabilitation counselor. Like Mr. Bopp, Ms. Kalikow works with people with disabilities and helps them identify work they are able to perform and then to locate suitable jobs; she also helps them find work. The United States asked Ms. Kalikow to perform a vocational evaluation for Mr. Bouchard to determine what he is now capable of doing and what his earning capacity is. As part of her preparation, she reviewed Mr. Bouchard's medical records as well as the reports and depositions of Mr. Bopp and she personally met with Mr. Bouchard in September 2006 and spoke with him over the phone in October 2006.

Ms. Kalikow stated that, in determining Mr. Bouchard's current physical abilities, she took into account Dr. Naranja's medical restrictions.  She concluded he was able to work and he could work within the sedentary to light category of work, as defined by the DOT.  Given this, Ms. Kalikow opined that Mr. Bouchard had several available employment opportunities, particularly in light of his transferable skills as a welder.  She stated that these opportunities included assembling and bench welding, sheetmetal fabrication, production work or, with slight employer accommodations, customer service for a welding supply company.  Ms. Kalikow posited that Mr. Bouchard would be able to work at a welding supply store if he were given a stool and permitted to alternatively sit and stand.  Ms. Kalikow testified that the possible jobs she identified for Mr. Bouchard ranged from $12.86 to $18.19 an hour.[14] Finally, it was Ms. Kalikow's opinion that, with some additional education and training, Mr. Bouchard would be capable of performing jobs such as electric motor repair, cellular telephone repair, electronic engineering technician or assembly work.  These jobs ranged from $10.62 to $14.44 an hour.

Cross-examination revealed that there is a question as to how the DOT rates some jobs Ms. Kalikow identified.  Mr. Bouchard suggested that some articulated jobs were actually categorized as requiring medium strength work capacity, and were beyond Mr. Bouchard's abilities.  Ms. Kalikow responded that welding fabrication and structural welding fabrication, for example, do require medium strength work capacity but, within that category of work, there are aspects of the work that do not require medium strength work capacity.

Mr. Bouchard asked whether Ms. Kalikow was aware of any job openings – for the type of jobs she just identified – within a reasonable commuting distance from Mr.

_____

[14] Ms. Kalikow stated that the figures she provided were based on the Maine Department of Labor occupational wage statistics for 2005.

Bouchard's home.  Mr. Bouchard noted that Mr. Bopp, in preparation for his trial testimony, had checked on whether there were any job openings within a commutable distance from Mr. Bouchard's home and found none.  Ms. Kalikow responded that she had no factual basis upon which to dispute Mr. Bopp's testimony, since she had not investigated the opportunities at the time of her report.  Similarly, Ms. Kalikow had not looked into the number of job openings or possible positions for any of the other jobs she identified, such as a cell phone technician, within a reasonable commuting distance to Mr. Bouchard's home.  Nevertheless, Ms. Kalikow's ultimate conclusion was that Mr. Bouchard now enjoys about the same ability to earn he possessed before the accident.

### C.  The Economist:  Dr. Alan Stewart McCausland

Mr. Bouchard presented the testimony of Dr. Alan Stewart McCausland.  Dr. McCausland has a Master's degree in economics, a Ph.D. in labor economics, and he teaches labor economics at the college level.  He was asked to value the rehabilitation plan that Mr. Bopp had set forth, i.e. the cost to fund that plan, and to determine Mr. Bouchard's economic loss.  To determine the latter, Dr. McCausland examined Mr. Bouchard's pre- and post-injury earning capacity.  There were two scenarios for earning capacity:  (1) that Mr. Bouchard has no ability to work and no post-injury earning capacity; and, (2) that he can work.   If he is able to work, Dr. McCausland acknowledged that his post-injury earning capacity would have to be determined and Dr. McCausland provided figures based on a variety of assumptions.   Finally, Dr. McCausland examined the fringe benefit components of Mr. Bouchard's economic loss.

Dr. McCausland prepared two spreadsheets from his calculations of Mr. Bouchard's lost earning capacity: one reflects his pre-injury earning capacity and the other his post-injury

earning capacity.  Pl.'s Ex. 29.  Dr. McCausland affirmed that much of his evaluation was an economic assessment of Mr. Bopp's data and figures.

### 1.  Mr. Bouchard's Earning Capacity

Dr. McCausland first calculated Mr. Bouchard's earning capacity as of the date of the injury – the present value of his estimated future earnings, but for the injury.  He began with the annual figure of $24,960.00.  He arrived at this figure by multiplying the wage rate of $12 per hour by 2,080 hours of work per year.  Dr. McCausland explained that he used 2,080 hours only as a starting point.

Dr. McCausland then made economic adjustments for the annual percentage raise expected each year for workers in the state of Maine, the annual percentage raise expected for a white, high school graduate, male, age thirty-five, the statistical probability of unemployment, as published by the Bureau of Labor, and the statistical probability of being unable to work, as published by the Department of Health and Human Services.  Each of Dr. McCausland's calculations also included adjustments based on the age-earnings profile.[15]  Finally, Dr. McCausland accounted for the twenty-five percent overall reduction in Mr. Bouchard's earnings, as provided by Mr. Bopp, due to his psychosocial factors.  Once the appropriate adjustments were calculated, Dr. McCausland effectively reduced Mr. Bouchard's earning capacity by thirty-three percent.  Applying this net reduction, Dr. McCausland calculated that Mr. Bouchard's expected earning capacity at age thirty-five was

---

[15] The age-earnings profile is data published annually by the United States Census Bureau.  Based on sex, education, and work habits, it provides the changes, in real earnings without inflation, economists determine for an individual as he or she ages.  Someone with an age earnings profile akin to Mr. Bouchard – a male, high school graduate – tends to experience decreasing earnings beginning in his 40s to 50s.   Dr. McCausland explained that as people age, especially male, high school graduates and people in the trades, their earnings do not necessarily keep up with inflation; if he did not include the age earning profile to adjust for those changes, he would be overstating an individual's earnings over his lifetime.

$17,482.13.   Dr. McCausland then adjusted this figure by the real discount rate[16] and calculated that Mr. Bouchard's present value of earning capacity at age thirty-five was $16,228.13.  He provided the same calculations for each year through age sixty-seven.

The total present value of Mr. Bouchard's earning capacity is $541,130.00.[17]   Dr. McCausland calculated the total present value of Mr. Bouchard's pre-injury fringe benefits to be $93,074.00.  He calculated fringe benefits at 17.2%, significantly less than the 23.78% figure expected in the construction trades.  Here, however, because Mr. Bouchard sometimes had employment with fringe benefits and other times did not, Dr. McCausland based his estimate on the private industry fringe benefits.  He did not include Social Security because it was his impression Mr. Bouchard was going to collect Social Security disability.

### 2.  Mr. Bouchard's Post-Injury Earning Capacity

To assess Mr. Bouchard's post-injury earning capacity, Dr. McCausland began with the list of potential jobs Mr. Bopp determined were the best options for Mr. Bouchard.  He then averaged the 2004 median hourly wage for each job, based on data published by the Maine Department of Labor concerning employment and wage rates in Maine.  The average hourly wage rate is $8.93.  Multiplied by the 2080 hours per year, the annualized wage for 2004 was calculated as $18,574.40.  Dr. McCausland then performed essentially the same calculations.   This time, however, there is a significant addition to the employment reductions: in addition to the thirty-three percent psychosocial reduction, Dr. McCausland

---

[16] Dr. McCausland explained that the real discount rate reduces future wages to present dollars so they are not inflated based on future dollar values.  He used a real discount rate of 2.25%, based on published treasury bond rates.

[17] The law distinguishes between past lost wages and future earning incapacity.  Dr. McCausland's figures meld the two.  Thus, the $541,130 figure includes the years from January 19, 2003 to mid-2006, when he made his calculations.  It is simpler to use one figure for past lost wages and future earning incapacity and the Court has done so; however, the parties should be aware that in assessing lost earning capacity, the Court's figures include lost wages.

calculated an additional twenty-two percent reduction due to Mr. Bouchard's injuries.[18]
Thus, Dr. McCausland applied a fifty-five percent employment reduction for post-injury
earnings.   Beginning in the full calendar year 2007, and applying the real discount rate, Dr.
McCausland calculated Mr. Bouchard's present value of earning capacity to be $8,436.94.
Totaling the yearly calculations for the post-injury present value of Mr. Bouchard's earning
capacity through the age of 47, Dr. McCausland arrived at $70,138.00.  Applying 17.2% for
fringe benefits resulted in net fringe benefits of $12,064.00.

### 3.  Net Loss in Earning Capacity

Dr. McCausland combined these sets of calculations and determined the total present
value of Mr. Bouchard's net economic loss to be $668,064.  Mr. Bouchard's present value of
earning capacity pre-injury ($541,130) less his present value of earning capacity post-injury
($70,138) yields $470,992.  His present value of fringe benefits pre-injury ($93,074) less his
present value of fringe benefits post-injury ($12,064) yields $81,010.   Adding to those
figures the present value of the rehabilitation plan costs ($116,062) yields a sum total of
$668,064.  This is the low end of the range of Mr. Bouchard's loss, because it assumes some
work capacity.

At the high end of the range, assuming no work capacity, Dr. McCausland calculated
that the net loss for the present value of earning capacity would be the full $541,130
($541,130-$0).   Similarly, his net loss for the present value of fringe benefits would be
$93,074.  Those figures, combined with the cost of the rehabilitation plan sum to $750,266.
Therefore, Dr. McCausland calculated Mr. Bouchard's net economic loss to be between
$668,064 and $750,266.

---

[18] The figure of twenty-two percent comes from Mr. Bopp's estimate that Mr. Bouchard will lose another two
years of work over the course of his work life.  Extrapolating that figure out to his work life comes to twenty-
two percent.

### 4.  Total Economic Loss

In addition to calculating Mr. Bouchard's loss based exclusively on the data provided by Mr. Bopp, Dr. McCausland also performed an analysis of Mr. Bouchard's loss based on Mr. Bouchard's own earnings history, using his historical earnings as a guideline.  Dr. McCausland did three separate analyses, based on five, ten and sixteen year earnings histories.[19]  Pl.'s Exs. 30, 31, 32, 33.

Beginning with the calculations based on Mr. Bouchard's previous five years of earnings, Dr. McCausland calculated Mr. Bouchard's average annual wage over the last five years converted into 2003 dollars.  It is $20,746.02.  Dr. McCausland explained that his previous calculations, such as the percentage increases and the real discount rates, are all the same save the starting wage.  That is because, in this analysis, Mr. Bouchard's psychosocial problems are already included, as these calculations were done using his actual wages while those issues were occurring in his life.  As such, Dr. McCausland did not apply the additional twenty-five percent employment reduction.   Dr. McCausland explained that the figure for Mr. Bouchard's pre-injury expected earning capacity based on Mr. Bouchard's five year earnings history – $20,746 – is about $3,000 higher than the $17,482 figure using Mr. Bopp's assumptions.  Based on Mr. Bouchard's five-year earnings, Dr. McCausland calculated that the low end of his net economic loss would be $801,798.00 and the high end, that is, assuming no post-injury mitigating employment, would be $884,000.00, approximately $130,000 higher than the range of economic loss using Mr. Bopp's assumptions.  Using Mr. Bouchard's ten year earnings history, Dr. McCausland calculated the range of economic loss

---

[19] Dr. McCausland explained that he performed the ten and sixteen year earning history calculations because of some of the issues that arose during his deposition and he did the calculations simply to be thorough.  However, he was adamant that he would never use the ten or sixteen year earnings histories.  He agreed that neither is a valid estimate of future wage loss.  Dr. McCausland further explained that, just as he would never use a sixteen year history, he similarly would not use a one-year earnings history.  He typically looks back three to five years.

to be between $1,032,845.00 and $1,115,047.00.  Pl.'s Ex. 31.  Using Mr. Bouchard's entire

sixteen year earnings history, upon leaving high school, Dr. McCausland calculated Mr.

Bouchard's range of loss to be between $1,192,472.00 and $1,274,674.00.  Pl.'s Ex. 32.

On cross-examination of Dr. McCausland, the United States pointed out that Mr.

Bopp had stated that Mr. Bouchard's work life expectancy was fifty-nine years old.  Dr.

McCausland, however, projected Mr. Bouchard's earning capacity to age sixty-seven.  When

pressed, Dr. McCausland explained that, although he did rely on Mr. Bopp's figures for

earning capacity and projecting those figures forward, work life expectancy is in the field of

labor economics and not vocational rehabilitation.  Work life expectancy tables are published

by the Bureau of Labor.  Dr. McCausland explained that he never had any expectation of

relying on Mr. Bopp's estimate of work life expectancy.  He reiterated that he relied on Mr.

Bopp for those things within Mr. Bopp's field, namely earning capacity and the disability

reduction.  He relied on his own personal expertise for those things within his own field,

namely the age earnings profile.  According to Dr. McCausland, the age earnings profile is

the more accurate analytical tool for the general issue of work life expectancy.   Indeed, Dr.

McCausland's resume lists an article he published discussing why work life expectancy

should not be used as an analytical tool.

The United States also drew Dr. McCausland's attention to demonstrative exhibit

182.  The exhibit tracks Mr. Bouchard's earnings history in a graph and reflects a high in

1991 of $46,656.47 and 2002 earnings of $11,973.50.  The United States noted that Dr.

McCausland had, on direct, observed that those figures were not in 2003 dollars.  Thus, the

United States sought to explore what the graph would look like were the earnings converted

into 2003 dollars.  According to Dr. McCausland's own calculations, the earnings in 1991

would be $63,032.89 in 2003 dollars.  Meanwhile, the earnings in 2002 would be $12,248.89 in 2003 dollars.  Pl.'s Ex. 32.  The point was that, once converted into 2003 dollars, Mr. Bouchard's drop in earnings becomes even more precipitous.[20]

## IV.  UNDISPUTED MATTERS

### A.  Past Medical Bills

Mr. Bouchard presented evidence that he has incurred medical bills totaling $172,968.00**.**  The United States does not object to this figure.  *Def.'s Closing Argument* at 1 n.1 (Docket # 70) ("Defendant does not dispute Plaintiff's $172,968 claim for past medical bills. . . .").

### B.  The Cost of the Rehabilitation Plan and Future Medical Bills

Dr. McCausland determined that the present value of the rehabilitation plan and future medical expenses, including the cost of future knee replacements, is $116,062.00.  Pl.'s Ex. 28.  The United States does not object to this figure.  *Def.'s Closing Argument* at 1 n.1 ("Defendant does not dispute . . . Plaintiff's estimate of $116,062 for rehabilitation and future medical expenses.").

## V. DISCUSSION

### A.  *Lovely v. Allstate Insurance Company*

In *Lovely*, the Supreme Judicial Court of Maine addressed whether "the single injury rule applies when a negligent actor, by aggravating a preexisting injury, produces an aggregate injury that is incapable of apportionment." 658 A.2d at 1092.  The Law Court concluded that the single injury rule does apply.  In March 1985, Mr. Lovely injured his right elbow; in April 1985, Mr. Lovely was involved in a car accident that caused further trauma to his right elbow.  At trial, the defendant argued that Mr. Lovely's damages resulted from his

---

[20] That is, a drop from $63,032 to $12,248 is more dramatic than a drop from $46,646 to $11,973.

preexisting condition.   Reviewing the application of the single injury rule in other jurisdictions, *Lovely* noted:

> [O]ne jurisdiction requires that a jury be instructed to impose liability on the defendant for the entire amount of the injury if it is unable to apportion damages between the accident in question and a preexisting condition. Even the cases that place the burden on the plaintiff to produce evidence on which to apportion damages acknowledge that the defendant is liable for all of the damage when the injury is indivisible.

*Id*. at 1092 (internal citation omitted).   The court concluded that the:

> single injury rule places any hardship resulting from the difficulty of apportionment on the proven wrongdoer and not on the innocent plaintiff.   In this case, the court, as the factfinder, found it impossible to apportion Lovely's injuries between the March and the April incidents. It should therefore have held [the defendant] liable for all of the damage to Lovely's[] elbow.

*Id*. at 1093 (internal citation omitted).

In his concurrence, then Justice Lipez explained the significance of the Court's decision.   He noted that the plaintiff still bears the burden to "establish a causal relationship between the injury that is the subject of the lawsuit and the alleged consequences of that injury."   *Id.* at 1094.   Once the plaintiff has met that burden, however, the "defendant who seeks to limit liability on the basis of a preexisting or subsequent injury has the same burden of proof as a defendant claiming comparative negligence or a failure to mitigate damages." *Id.*   Justice Lipez emphasized that a plaintiff does not have "some discrete burden to prove that the injury is incapable of apportionment before the defendant has the burden of establishing the causal relationship between the preexisting or subsequent injury and the claim of damages.   There is no such discrete burden." *Id.*   Instead, the issue of apportionment presents itself "whenever the defendant, in response to the damage claimed, produces

evidence of a preexisting or subsequent injury which the defendant asserts is the cause of some portion of the plaintiff's problems." *Id.* Justice Lipez stressed that "[t]here is no need for the court to make a preliminary determination that the injury is incapable of apportionment before imposing the burden of apportionment on the defendant" since the defendant's burden is "inherent in the defendant's claim that there should be apportionment."

*Lovely* – the majority opinion and the concurrence – focuses the Court's evaluation of the evidence.

## B. The Medical Analysis

### 1. Areas of Agreement

Although there are areas of disagreement between the orthopedic surgeons who testified in this case, there is substantial agreement about Mr. Bouchard's orthopedic injuries and his medical future. The doctors concur about the causal link between the January 19, 2003 accident and Mr. Bouchard's right knee problems; they agree that the total knee replacement surgery was necessary and appropriate. They each testified that Mr. Bouchard will need revisions of his total knee hardware in the future and they agree he should restrict his level of activity to avoid wear on the hardware and hence lengthen the interval between surgeries. Moreover, the Court finds that the areas of disagreement that were highlighted at trial are actually less significant than initially appears. The doctors' opinions on the longevity of the knee replacement are in substantial conformity, and the doctors' opinions as to specific restrictions, although somewhat contradictory, have not been translated into a meaningful difference in earning capacity.

### 2.  The Longevity of the Total Knee Replacement

One area of disagreement is the length of the useful life of the total knee hardware. Dr. Naranja places the useful life of his current total knee replacement at between ten and twelve years, noting that in view of his comparative youth, the ten year figure is probably more accurate; Dr. Bono opined that the useful life of the knee is between fifteen and twenty years.  Discounting Dr. Naranja's more pessimistic opinion of ten years and similarly discounting Dr. Bono's more optimistic view of twenty years, the result is a range between twelve and fifteen years.  As the doctors' varying opinions suggest, the exact longevity of the device is not susceptible to mathematical certainty.

The evidence, however, does not explicate the significance of this relatively minor difference of opinion. The parties agree on the cost of future medical bills and have not calculated different future medical special damages, depending upon which medical opinion is accepted.  As regards the impact of more or less frequent surgeries on the remaining elements of his damages, the Court infers Mr. Bouchard will face problems with future total knee surgeries similar to those he encountered with his first total knee surgery.  The problems include pain, discomfort, and lost time from work.  Otherwise, there is no evidentiary basis for making any findings about whether or how the differences in medical opinion as to longevity should translate into damages. The Court finds for purposes of assessing damages that Mr. Bouchard's total knee hardware will require replacement every twelve to fifteen years.

### 3.  The Level of Restriction

A second area of disagreement is the level of physical restriction that should be imposed on Mr. Bouchard.  Dr. Naranja would have Mr. Bouchard nearly completely disabled, but absent total disability, he recommended an impressive set of restrictions; Dr. Bono imposed a similar, but less restrictive set of limitations.  The doctors agree on some restrictions:  no climbing, kneeling, crouching, crawling, or balancing and, within an eight hour day, no standing or walking for more than four hours without a break and no driving more than four hours again without a break.  The doctors disagree on the weight limitations.  Dr. Naranja says Mr. Bouchard may frequently lift ten to twenty pounds and occasionally over twenty pounds; Dr. Bono says that he may lift up to forty pounds, but only occasionally.  The doctors also disagree on how long Mr. Bouchard may engage in various activities without taking a break: (1) Dr. Naranja believes Mr. Bouchard may sit up to two hours; Dr. Bono says four; (2) Dr. Naranja testified that he may stand or walk up to one hour; Dr. Bono says two; (3) Dr. Naranja restricts him to driving up to two hours; Dr. Bono says four.  They also disagree about what he can do during an eight hour day.  Dr. Naranja says that Mr. Bouchard can sit up to four hours in an eight hour day; Dr. Bono says he can sit the full eight hours.

The Court rejects Dr. Naranja's preference that Mr. Bouchard do no work whatsoever.  Mr. Bouchard is restricted only in the use of his right lower extremity; he is otherwise wholly unrestricted.  For example, he is able to use both arms and hands and, most significantly, Mr. Bouchard is able to use his mind.  Mr. Bouchard is a high school graduate and is thirty-nine years old.  Although not academically inclined, Mr. Bouchard is very mechanically inclined.  He is knowledgeable, articulate, and engaged when discussing the

field of welding and these skills and interests are transferable to employment, despite his physical limitations. While Dr. Naranja surely has the best intentions, to inform a thirty-nine year old man that he has no work capacity whatsoever because he has a total knee replacement improperly reduces his earning capacity only to his knee, ignores his capacity to work within sensible restrictions, and fails to take into account the impact such a permanent and total restriction will have on the whole person. The Court firmly rejects Dr. Naranja's recommendation of "no work capacity" as misguided patient advocacy.

This leaves the question of what level of restriction Mr. Bouchard must obey and its impact on his post-injury earning capacity. The two expert witnesses, though knowledgeable and well qualified, are for separate reasons not wholly convincing. While Dr. Naranja's testimony betrays an undercurrent of patient advocacy, Dr. Bono's opinions are compromised by a lack of foundation.

The United States inexplicably failed to schedule a Rule 35 examination for Dr. Bono to meet Mr. Bouchard, to take his own history, or to actually examine him and further failed to supply him with a complete set of medical records. Dr. Bono has never even seen or spoken to Mr. Bouchard. Dr. Bono testified that he reviewed Dr. Naranja's medical records, Dr. Naranja's deposition transcript, Mr. Bopp's vocational rehabilitation report, some notes of conversations between Dr. Naranja and Mr. Bopp, and a chronology. There is no evidence that Dr. Bono reviewed the medical records of Dr. Conner or his deposition, the physical therapy records, the records from TAMC, Carey Medical Center, or even the hospital records from EMMC, reflecting Dr. Bower's initial findings and surgery. Nor is there evidence that Dr. Bono ever reviewed any original films or diagnostic tests performed on Mr. Bouchard. Dr. Bono's opinions, therefore, are more convincing for his insight into the typical total knee

replacement patient to the extent Mr. Bouchard is the typical patient; to the extent Mr. Bouchard is not the typical patient, Dr. Bono's opinions are far less persuasive.

Before attempting to resolve the proper level of post-injury restriction, a preliminary question is whether the differences between the doctors' restriction levels make a significant difference in Mr. Bouchard's earning capacity. As it turns out, the difference in the medical opinions between Drs. Naranja and Bono was not translated by the vocational experts into a difference in earning capacity. Mr. Bopp assumed that Dr. Naranja's restrictions applied, but so did Ms. Kalikow.[21] Thus, although the Court could make a finding as to whether to accept Dr. Naranja's or Dr. Bono's level of restriction, since there is no evidence on the impact the differences would have on Mr. Bouchard's actual earning capacity, it is unnecessary to resolve a purely academic disagreement.

Dr. Naranja issued another orthopedic opinion that bears mention. He confirmed that even if Mr. Bouchard were to return to work, he would have "an earlier separation from the workforce" and would be "disabled from competitive work sometime within his 45th and 50th year." Pl.'s Ex. 25 at 107. Dr. Naranja explained at trial that his current knee replacement would likely fail and that it may be quite difficult for Mr. Bouchard to ambulate and get around. He also noted that Mr. Bouchard will have periods of temporary total disability subsequent to future knee replacements. Dr. Bono was not expressly questioned about this issue.

As with Dr. Naranja's earlier opinion on total disability, the Court rejects Dr. Naranja's view that, once Mr. Bouchard has another knee replacement, he will be totally

---

[21] The following question and answer appear in Ms. Kalikow's trial deposition:
    Q. Okay. So did you – did you – for what you did, did you accept Dr. Naranja's restrictions or not?
    A. Yes, I did.
*Kalikow Dep.* at 10:15-17 (Docket # 71).

disabled from work.  The Court accepts the doctor's opinion that Mr. Bouchard will have periods of temporary total disability following future knee surgeries; these are likely to be significant and will affect his future ability to obtain and retain employment.  But, the Court is not convinced that after the recovery periods, Mr. Bouchard will have no work capacity. In fact, the doctor's statement that Mr. Bouchard will have "periods of temporary total disability subsequent to future knee replacements" contradicts any suggestion that Mr. Bouchard will be permanently disabled following subsequent knee replacements. Nevertheless, the Court accepts the doctor's opinion that future surgeries will become increasingly problematic, that the periods of incapacity from each successive surgery will be longer, and that ultimately – though it is unclear when – the amount of available bone in the knee joint may be compromised by repeated procedures, leaving Mr. Bouchard with either a fusion or no knee.

### C.  The Vocational Analysis

#### 1.  Mr. Bouchard's Pre-existing Physical Injuries

To the extent Mr. Bouchard's pre-existing right ankle problems continued through the January 19, 2003 motor vehicle accident, that injury has been subsumed by the severity of his right knee problems.  There is no evidence that since the 2003 accident, he has required any significant medical treatment for his right ankle, that he is receiving medication to alleviate symptoms in his right ankle, or that his physical restrictions have been enhanced by his right ankle injury.   The Court discounts, therefore, the impact of his pre-existing ankle injury on the damages in this case.

### 2.  Mr. Bouchard's Pre-existing Drug Addiction

The state of the evidence on the impact of Mr. Bouchard's pre-existing drug addiction on his current damages is multilayered.  The evidence establishes that Mr. Bouchard was profoundly addicted before the January 19, 2003 accident and that he has continued to struggle with addiction since the accident.   The evidence establishes that the accident increased Mr. Bouchard's pain and dramatically increased his need for methadone.  In fact, at one point, Dr. Conner increased his methadone dosage fivefold.   Applying *Lovely,* Mr. Bouchard established that the January 19, 2003 accident exacerbated his need for methadone and the Court finds that the 2003 accident combined with his pre-existing condition to result in a higher post-accident aggregate level of methadone use.

The same cannot be said, however, of Mr. Bouchard's addiction to other drugs.  Mr. Bouchard acknowledged that he began using methamphetamine as early as 1997 and, in 2000, he was buying amphetamine, methamphetamine, and a variety of prescriptive medications on the street.  The evidence further establishes that Mr. Bouchard's pre-existing narcotics addiction was unusually severe.  Common indicators of drug addiction – multiple unsuccessful detoxifications and hospitalizations, a criminal history, unstable employment, and the use of street drugs – predate 2003.  It is true that Dr. Conner revealed that blood work done on Mr. Bouchard well after the accident disclosed the presence of methamphetamine, amphetamine, and marijuana.  *Conner Dep.* at 33-34.  There is no evidence in this record, however, that the January 19, 2003 accident had any impact on Mr. Bouchard's long-term pre-existing use of drugs other than methadone.   Therefore, as regards his underlying

addiction for non-narcotic drugs, the Court has not considered the accident to have played a role in exacerbating his pre-existing condition.

Returning to methadone, under *Lovely*, the burden shifts to the United States to apportion from the aggregate injury the continuing impact of the pre-existing problem.  The best evidence of the impact of the accident is the numerical difference between the level of methadone dosage before and after the accident.  Dr. Conner testified that just before the accident, he prescribed 10 milligrams of methadone four times per day.  *Conner Dep.* at 59.  After the accident, he was ultimately required to gradually increase the dose until the dose level was nearly five-fold the pre-existing level.  *Id.* at 62.  Based on this evidence, the Court finds that the United States sustained its burden to separate out a percentage of his need for methadone; to the extent the accident caused an increase in Mr. Bouchard's need for methadone, one-fifth of his post-accident methadone treatment existed before the January 19, 2003 accident.

The practical significance of this finding, however, is muted.  The last word from Dr. Conner was that Mr. Bouchard is no longer having problems with opiate addiction. *Conner Dep.* at 22, 47 ("[I]f he's having cravings for narcotics, that's one thing. . . . He's not having that.").  Dr. Conner testified that he is "off narcotics" and the methadone "should be cleared and out of his system."[22]  *Id.*  This is because Dr. Conner began Mr. Bouchard on Suboxone and this medication eliminated his addiction.  *Id.* at 49 ("I mean, the addiction problem is – he's not having cravings to go out and use. . . . my last GC/MS . . . showed everything is okay.  Nothing's there.").  His problem, instead, is chronic pain.  The new medicines have

---

[22] Dr. Conner's use of the term "narcotics" is in the medical sense, meaning that it refers to opiates.  Dr. Conner made it clear that Suboxone is an "opiate blocker" and addresses only addictions to opiates, such as methadone or heroin.  *Conner Dep.* at 28.  However, Suboxone "won't touch crystal meth . . . or won't touch addiction to cannaboids.  It won't help with that.  It won't help with cocaine addiction."  *Id.* at 27.

been unable to address his pain.  *Id.* at 49 ("[T]he guy's not doing well because of the pain."). He is also experiencing depression.  *Id.* at 47.

Thus, Mr. Bouchard established that the January 19, 2003 accident exacerbated his need for methadone and, in response, the United States successfully carved out one-fifth of his pre-existing methadone use from his total damages.  Even though the period of aggregate methadone use – and whatever corresponding impact it may have on Mr. Bouchard's current damages – is limited to the period from January 19, 2003 to December 2006, the Court considers Mr. Bouchard's need for Suboxone to have replaced his need for methadone. There is no evidence that he would have required Suboxone in the absence of the January 19, 2003 accident and the escalated methadone dosage levels as a result; nor is there any basis on which to apportion the current or future level of Suboxone between the pre-existing and subsequent condition.  Accordingly, the Court considers the Suboxone prescription entirely a sequela of the accident.

### 3.  Mr. Bouchard's Pre-existing Criminal History

Mr. Bouchard's criminal history includes a number of misdemeanor convictions and one felony conviction.  He committed seven misdemeanors, ranging from theft to disorderly conduct, between March 1995 and February 1996.  In April 1999, he was charged with felony assault, was convicted in November 2000, and was sentenced to one year in jail, all but sixty days suspended.  This is Mr. Bouchard's only felony.  There is no further detail in the record about this conviction.  He was not asked whether this conviction was a Maine state conviction, but the timing – spring 1999 – suggests he was in Maine.[23]

---

[23] Mr. Bouchard testified that he was employed at McCain's Foods in Easton, Maine from the fall of 1998 through the fall of 1999.

Most Maine assaults are misdemeanors.  *See* 17-A M.R.S.A. § 207(1)(A).  However, in 1999, Maine law classified some assaults as felonies.  *See* 17-A M.R.S.A. § 207(1)(B) (assault by someone at least 18 years old against a person less than 6 years old), 17-A M.R.S.A. § 208 (aggravated assault – causing serious bodily injury, bodily injury with the use of a dangerous weapon, or bodily injury with extreme indifference to the value of human life); 17-A M.R.S.A. § 208-B (elevated aggravated assault – serious bodily injury with the use of a dangerous weapon, depraved indifference to the value of human life).  Even assuming this was a Maine conviction, it was never clarified which felony assault Mr. Bouchard was convicted of.

Each felony assault under Maine law reflects serious conduct and by its nature a felony conviction has some impact on a person's employability.  For example, by virtue of the conviction, he would be prohibited from employment in a position that required a firearm, such as law enforcement.   But, in the absence of more evidence, the Court cannot draw any specific conclusions about the particular impact this felony conviction, combined with the misdemeanor convictions, would have on his employability.[24]

Mr. Bopp testified that Mr. Bouchard's prior felony would not have much of an impact on his employability as a welder – although it would have some impact on his competitiveness for getting welding openings – but that it would impact his placeability and his competitiveness for other kinds of work outside of the welding trade.  He explained that his pre-accident criminal history as well as his drug dependency would be a detriment to his ability to get hired, since these factors will lead employers to select from candidates without

---

[24] For example, if he violated § 207(1)(B), this conviction could affect his ability to obtain employment around young children.  Also, there is no evidence that the events underlying his felony conviction, when combined with his prior misdemeanors, caused him to develop a reputation in the Caribou – Presque Isle area, which would have deterred potential employment.

criminal histories or drug dependencies.  But Mr. Bopp did not believe that Mr. Bouchard's criminal history or drug dependency appreciably impacted his welding prospects because people in the welding or construction trades tend to present more of those factors relative to workers in other labor pools.

Based on his prior psychosocial problems, including his criminal record, Mr. Bopp reduced his potential earnings by 25%.  Ms. Kalikow was not asked her opinion on the impact of Mr. Bouchard's prior criminal history on his ability to earn wages.  Absent any countervailing expert opinions and absent other specific evidence on the impact of the prior criminal record, the Court accepts Mr. Bopp's conclusion that the combination of Mr. Bouchard's psychosocial problems, including his drug use and his criminal record, decreased his pre-accident earning capacity by 25%.

### D.  The Economic Analysis

#### 1.  Pre-Accident Earning Capacity

The most vigorously contested issue in this case is Mr. Bouchard's pre-accident earning capacity.  Dr. McCausland used two different approaches:  (1) applying Mr. Bopp's assumptions, Dr. McCausland arrived at an annual pre-accident earning capacity of $16,228.13; and, (2) using a five-year history of Mr. Bouchard's actual earnings, he arrived at a figure of $20,746.02.  The United States strenuously argues that either figure grossly overstates Mr. Bouchard's pre-accident earning capacity, noting the steep decline in Mr. Bouchard's actual earnings during the five-year interval before the accident.

Mr. Bouchard's actual earning history presents multiple problems as a predictor for his future earnings.  Dr. McCausland stated that the five year history is the best indicator, because it incorporates highs and lows.  But, as the United States points out, using an average

of the five year period ignores a significant three-year decline, beginning in 2000, from $33,172 to $23,479 to $11,974.  There is a strong implication that Mr. Bouchard's increasing failure to work steadily after 2000 was the culmination of his drug dependence, his ankle injury, and his criminal history.  There is also an argument that the five-year period includes unusual events, such as Mr. Bouchard's decision not to work as a welder in 1998 and a marked deviation from his typical earnings in 2002.  In either case, to average his five-year earnings would be inaccurate.  Instead, the Court elects the earning capacity analysis.[25]

### a.  Hourly Rate

In making his calculations, Mr. Bouchard's experts assumed that, as a welder, he could earn $12.00 per hour.  This wage rate is less than the prevailing rate for many welding jobs and the Court accepts the $12.00 rate.

### b.  Hours Per Year

The parties disagree about the number of hours a welder can reasonably be expected to work.  In fact, the Plaintiff's own experts disagree.  Mr. Bopp stated that the average welder works between 1,600 and 1,800 hours per year; Dr. McCausland testified that, despite Mr. Bopp's opinion, it was his view that the typical welder works 2,080 per year.  Dr. McCausland used 2,080 hours per year as a starting point for his analysis.

On this point, the Court accepts the opinion of Mr. Bopp over the opinion of Dr. McCausland.[26]  To work 2,080 hours per year would require a person to work 40 hours per week, 52 weeks per year.  Although many skilled workers in the construction trades work overtime, the Court cannot accept the economist's analysis over the opinion of the vocational

---

[25] The actual earnings calculations remain a useful benchmark against which to measure the Court's final conclusions.

[26] Dr. McCausland insisted that he was more of an expert on this issue than Mr. Bopp.  Be this as it may, the Court is not convinced that Dr. McCausland's more academic approach better reflects the real world than Mr. Bopp's practice-based expert opinion.

expert. The Court starts with the average figure of 1,800 hours per year. Using the economist's own figures, the Court reduces the starting point for his calculations by 13.46% (2,080 – 1,800 = 280; 280 = 13.46% of 2,080).

### c. Fringe Benefits

Dr. McCausland calculated that Mr. Bouchard's fringe benefits would equal 17.2% of his wages. Again, this figure is less than the 23.78% usually used for the construction trades, but Dr. McCausland applied the lower percentage because Mr. Bouchard did not always receive fringe benefits. Dr. McCausland explained that whenever Mr. Bouchard worked on a union or federal government job, he would have received union wages and union benefits; for other jobs, Mr. Bouchard would have received legally mandated benefits, which in the construction industry run around 13%.[27] The 17.2% figure is the total amount of fringe benefits typically used in private industry. Pl.'s Ex. 29.

The United States objects to the 17.2% figure. First, the United States claims that Mr. Bouchard did not have any fringe benefits other than the legal minimum since 1998. *Def.'s Closing Argument* at 2. This is not quite correct. Mr. Bouchard conceded that since 1998, he did not have any retirement benefits, but he did not testify that he had no fringe benefits at all since that time. The United States then argues that Dr. McCausland's report itself confirms that the applicable percentage for legally mandated benefits is only 3%, not the 13% that Dr. McCausland mentioned. *Def.'s Closing Argument* at 2. The evidence on this point is confusing. The 3% figure is actually 3.46% and reflects the percentage for legally mandated benefits – other than social security – for private industry. Social Security is listed at 6.20%.

---

[27] Dr. McCausland described those benefits as including workers' compensation and unemployment benefits. He did not include Social Security, because he concluded that Mr. Bouchard would likely receive Social Security disability. The 17.2% figure includes some additional benefits such as health insurance, a small life insurance and accidental death and disability policy, and retirement savings. Pl.'s Ex. 29.

The 13% figure consists of social security plus 6.99%, the higher cost of legally mandated benefits in the construction field.

It is difficult to sift through these calculations.  However, the Court accepts Dr. McCausland's testimony that it would be inappropriate to include Social Security, if Mr. Bouchard is to receive Social Security disability benefits.  It will follow his lead in excluding from legally mandated benefits the 6.2% for Social Security.  Next, the Court agrees that Mr. Bouchard should receive a percentage for other legally mandated benefits but concludes the appropriate rate to use is that for the construction industry: 6.99 %.  Finally, even though Mr. Bouchard worked for some government contractors or subcontractors and alongside some union workers, there is no evidence that he received employer-paid insurance and he expressly testified he did not receive employer-funded retirement benefits.  The Court excludes those from the fringe benefit calculation.

The net effect is that Mr. Bouchard's earning capacity includes the legally mandated benefits – except for social security – available to similar workers in the construction field of 6.99%, not the 17.2% figure Dr. McCausland used.

### d.  Adjustment for Mr. Bouchard's Pre-existing Circumstances

Mr. Bopp applied a 25% reduction for Mr. Bouchard's work life, concluding that he would be out of the work force 25% of the time more than his counterpart without Mr. Bouchard's particular problems.  Mr. Bopp's opinion on this issue is the only expert opinion.[28]  A strong argument could be made that the 25% reduction underestimates the seriousness of Mr. Bouchard's pre-existing problems and their likely effect on his future employment.  Nevertheless, there is no other expert opinion on this issue and a 25%

---

[28] Ms. Kalikow did not express a view on the 25% reduction nor was she asked to comment on Mr. Bopp's opinion.

reduction is as reasonable as any other percentage the Court could generate based on the record.  The Court accepts Mr. Bopp's 25% reduction as a valid reflection of the impact of Mr. Bouchard's pre-existing set of difficulties on his earning capacity.

### e.  Conclusion:  Mr. Bouchard's Earning Capacity

Dr. McCausland started his calculations with the annual wage figure in 2003 of $16,228.13 and calculated the present value of Mr. Bouchard's pre-injury earning capacity at $541,130.  He figured the present value of fringe benefits at 17.2% to equal $93,074.  The Court has determined that the earning capacity figure must be reduced by 13.46% and the resulting figure must be multiplied by 6.99% to arrive at the proper amount of fringe benefits.   The figure, therefore, would be $468,293.90 ($541,130 - $72,836.10 = $468,293.90) plus a fringe benefit figure of $32,733.74 ($468,293.90 x 6.99% = $32,733.74). The Court finds that the present value of Mr. Bouchard's pre-injury earning capacity, including fringe benefits, totals $501,027.64.[29]

### 2.  Post-Injury Earning Capacity

The parties also vigorously dispute Mr. Bouchard's post-injury earning capacity. Even though the Court has accepted Dr. Naranja's range of imposed restrictions, the parties still present markedly different views of Mr. Bouchard's future employment prospects.  Mr. Bopp opines that Mr. Bouchard cannot return to work as a welder and, given his lack of transferable skills and his significant level of restriction, Mr. Bopp lists a series of unskilled and low paying jobs he could perform, including dishwasher, dining room and cafeteria

---

[29] The Court recognizes that this figure is not as precise as Dr. McCausland's.  Dr. McCausland engaged in a series of complex calculations with varying figures to arrive at the present value of his estimate of these benefits.  To be absolutely precise, altering one factor would require a complete recalculation, but this Court has neither the time nor expertise to make new present value calculations, based on newly made assumptions.  Even if it accepted Dr. McCausland's elaborate calculations in their entirety, earning capacity, particularly in this case, contains subjective judgments, not susceptible to mathematical certainty.  With this in mind, the Court has determined its pre-injury figure by a standard of more likely than not.

attendant, bartender, packer, maid and housekeeper, food preparation worker, laundry and dry cleaning worker, cleaners of vehicles and equipment, stock clerk and order filler, and general office clerk.  Regarding the field of welding, Mr. Bopp allows that Mr. Bouchard could perform limited bench welding or a similar position.  Pl.'s Ex. 5.  The hourly rate for these jobs ranges from a low of $7.08 to a high of $15.89 for the bench welding positions. Mr. Bopp also observed, however, that Mr. Bouchard's long-term ability to perform even these jobs is compromised by his total knee replacement and the periodic need for revisions.

Ms. Kalikow presents a much more optimistic picture of the likelihood of Mr. Bouchard's re-employment.  Ms. Kalikow noted that Mr. Bouchard was "mechanically inclined," that he "prided himself in [the] quality of his welding expertise," that he was able to "read manuals and figure out what he was supposed to do as a result," and that "he very much would like to be able to continue welding and that he was motivated to return to work." *Kalikow Dep.* at 9:1-8.  She thought he had considerable transferable skills in the field of welding and, even within his substantial limitations, he would be able to perform assembling and bench welding, some sheet metal fabrication, and with some accommodation, act as a customer service sales person for a welding supply company or perform some production work.  The job modification could be as simple as providing him with a stool and allowing him to take periodic breaks.  With some additional training, Mr. Bouchard could also work in electric motor repair, cellular telephone repair, as an electronic engineering technician, or performing assembly work.  The hourly range of pay for these jobs runs from $10.62 to $18.19.

Having had the opportunity to evaluate Mr. Bouchard during his testimony, the Court finds Ms. Kalikow's view of Mr. Bouchard much more convincing than Mr. Bopp's.

Although Mr. Bouchard may not be academically gifted, he is very mechanically inclined and rightfully proud of his welding ability. He is certified in a variety of sophisticated welding skills, which reflect his aptitude and ability. When he testified about welding, Mr. Bouchard was knowledgeable, enthusiastic and articulate. He was justly proud of the fact that he had never failed a welding test and, despite his significant psychosocial problems, there is no evidence that his employers were ever dissatisfied with his job performance as a welder. With this skill and aptitude, the Court cannot concur with Mr. Bopp that Mr. Bouchard's knee problems consign him to low-skilled jobs that do not take advantage of his welding knowledge and ability.

This is not to say Mr. Bouchard will be hired in the future as readily as he was in the past. He is incapable of performing many welding jobs, including those requiring awkward positions, working at heights, and heavy lifting. For the jobs he can perform, he will require some accommodation, will have to attend periodic medical appointments, and will suffer extended periods out of work for future surgeries. He also faces a disinclination among some employers to hire physically injured prospective employees, when unrestricted, qualified applicants are available. Finally, he lives in Caribou, Maine, which has an extremely limited job market for the restrictive type of work he can perform.[30]

The Court thus finds that Mr. Bouchard retains the capacity to earn wages roughly equal to his pre-injury hourly wage of $12.00 per hour plus legally mandated benefits, but it also finds that his earning capacity has been significantly affected by his accident-related injuries.

---

[30] Mr. Bopp addressed this issue. He found only fifteen production weld machine operator and solder jobs in Aroostook County and no openings. Ms. Kalikow had not recently investigated the job market in Aroostook County and was unable to testify that there are jobs within his area available to Mr. Bouchard. *Kalikow Dep.* at 20:14-15.

### 3. Calculations

Again, Dr. McCausland offers the sole calculations of Mr. Bouchard's post-injury earning capacity.  Dr. McCausland concluded that the present value of Mr. Bouchard's post-injury earning capacity at $70,138 and his fringe benefits at $12,064 for a total of $82,202.  In broad terms, he arrived at this figure by averaging the hourly wages for all the jobs, ranging from dishwasher to bench welder, reaching an average hourly wage of $8.93, starting with 2,080 hours per year, escalating that figure to reflect Aroostook County's average increase in wages, reducing that figure by some fraction each year according to the age earnings profile and other employment data, applying a discount rate, and reaching a present value.  Pl.'s Ex. 29.  He also assumed the 17.2% fringe benefit figure.  *Id.*

Thus, for example, in calculating the present value of Mr. Bouchard's residual earning capacity for the year 2007, Mr. McCausland began with an adjusted earning capacity of $19,447.40:  2,080 x $8.93 = $18,574.40; $18,574.40 x 4.7% = $873.00; $18,574.40 + $873.00 = $19,447.40.  He then multiplied that figure by 1.408% in accordance with the age earning profile and added that result to $19,447.40 to arrive at $19,721.22.  He reduced that figure by an employment reduction of .4475, reflecting the probability of unemployment for a male, high school graduate, the probability of being unable to work, and an additional factor that includes his pre-existing psychosocial factors plus a 22% further reduction for the impact of the accident:  $19,721.22 x .4475 = $8,825.25.  Applying the discount rate, he arrived at a present value for 2007 of $8,436.94.

The Court earlier found that if Mr. Bouchard returned to work, he could earn an hourly wage equal to the $12.00 per hour figure he was assumed to earn as of the date of his injury.  It also found that Dr. McCausland's 2,080 hour assumption too optimistic for a

welder and instead used the annual figure of 1,800 hours.  The Court begins the analysis with a slightly higher figure:  $21,600 (1,800 x 12.00 = $21,600).  The starting value is $22,615.20 ($21,600 x 4.7% = $1,015.20; $21,600 + $1,015.20 = $22,615.20).  It accepts the remainder of Dr. McCausland's analysis; using $22,615.20 as the starting value and applying the rest of Dr. McCausland's calculations for the years 2006-2015, the sum is $81,225.74.  The fringe benefit calculation follows suit.  Dr. McCausland concluded that the post-injury amount for fringe benefits, based on 17.2%, was equal to $12,064.  The Court applies the same post-injury fringe benefit calculation that it applied pre-injury:  $81,225.74 x 6.99% = $5,677.68.

The Court finds that the present value of Mr. Bouchard's post-injury earning capacity is $81,225.74 and the present value of Mr. Bouchard's post-injury fringe benefits is $5,677.68 for a total present value of $86,903.42.

### a.  Net Loss:  Lost Wages and Earning Capacity

The Court combines its calculations for Mr. Bouchard's pre-injury earning capacity, including fringe benefits, with its calculations for his post-injury earning capacity, including fringe benefits, to determine his net loss.  Subtracting the present value of Mr. Bouchard's post-injury earning capacity ($81,225.74) from the present value of Mr. Bouchard's pre-injury earning capacity ($468,293.90) yields a net loss of $387,068.16.  Subtracting the present value of Mr. Bouchard's post-injury fringe benefits ($5,677.68) from the present value of Mr. Bouchard's pre-injury fringe benefits ($32,733.74) yields a net loss of $27,056.06.  Thus, the total present value for Mr. Bouchard's net loss for earning capacity, including fringe benefits is $ 414,124.22 ($387,068.16 + $27,056.06 = $414,124.22).[31]

---

[31] As noted earlier, this figure includes past lost wages as well as future lost earning capacity.

### b.  Special Damages:  Total

Mr. Bouchard has sustained the following special damages:

| | |
|---|---|
| 1) Past Medical Bills: | $172,968.00 |
| 2) Future Medical Bills & Rehab: | $116,062.00 |
| 3) Lost Earning Capacity and Fringe Benefits: | $414,124.22 |
| 4) Total | $703,154.22 |

### c.  Permanent Impairment

Dr. Bono assessed thirty-seven percent lower extremity impairment of the right leg and fifteen percent whole person impairment.  The Court is not assessing a damages amount separately for permanent impairment, but has considered Mr. Bouchard's permanent impairment in its determination of pain and suffering damages.

### d.  Pain and Suffering

There is no dispute that Mr. Bouchard sustained a painful and disabling injury as a consequence of the January 19, 2003 motor vehicle accident.  The circumstances of the accident were exacerbated by the presence of his son Brandon as a passenger and Mr. Bouchard's concern for his son's wellbeing.  Since the accident, Mr. Bouchard's life has been permanently and markedly changed.  He has undergone multiple surgeries, including a total knee replacement; he has had to take serious pain medications; he has not found re-employment in his field of welding; and, he has curtailed his outside activities, especially the sporting and recreational activities he enjoyed sharing with Brandon.   The Court is extremely concerned about the prospect of multiple knee replacements in a man as young as Mr. Bouchard and the evidence reveals that he faces the certainty of a series of future replacements and an increasing uncertainty of result.

Mr. Bouchard was not untroubled before the motor vehicle accident.  He had a bad ankle, a criminal record, and most significantly, an uncontrolled problem with substance abuse.  But, with all that, he was a good father, an accomplished welder, and the accident took away his dream to fuse the two:  to teach Brandon the welding trade and open a father-son business together.  Moreover, to receive damages, Maine law does not impose the unrealistic expectation that injured plaintiffs be perfect before they are tortiously injured.  Instead, the tortfeasor takes the plaintiff as he finds him, and under *Lovely*, Mr. Bouchard has demonstrated that the accident combined with his pre-existing condition has resulted, and will likely continue to result, in a profound degree of past, present, and future pain and suffering.  By contrast, the United States has largely failed to sustain its burden to apportion out Mr. Bouchard's pre-existing conditions from his combined injuries.

The Court awards Richard Bouchard the sum of $396,845.78 in pain and suffering and permanent impairment damages.

## VI.  CONCLUSION

The Court ORDERS judgment to issue in favor of Richard Bouchard and against the United States of America in the total amount of One Million One Hundred Thousand Dollars and No Cents ($1,100,000.00).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 13th day of August, 2007